POWELL v ST JOHN HOSPITAL

Docket No. 208928. Submitted February 8, 2000, at Detroit. Decided May
9, 2000, at 9:25 A.M.

Milomir Tomic brought an action in the Wayne Circuit Court against
St. John Hospital and others, alleging that the failure to diagnose
the perforation of Gary Tomic's colon in a timely manner and to
render proper treatment for that condition caused Gary Tomic's
death. Karen Powell, as personal representative of the estate of
Gary Tomic, was substituted as the plaintiff. At trial, a key witness
for the plaintiff was Dr. Peter Tiernan, who at the time the dece-
dent was a patient was a third-year surgical resident with the
defendant hospital. Tiernan testified that some of the doctors
employed by the hospital were reluctant to associate or treat
homosexuals and that some doctors had referred to the decedent, a
homosexual, as a "dirt bag," and further testified that other mem-
bers of the staff had disparaged women, "people of color," and
uninsured patients. Tiernan testified that certain aspects of the
treatment given to the decedent constituted "bad medicine" and
that he had observed compromising progress notes and reports
being removed from patients' charts. Although Tiernan admitted
that he had been required to repeat the third year of his residency
with the hospital and that his employment had been terminated
midway through that year, he asserted that these events had been
the result of his having repeatedly complained to the hospital
administration about deficiencies in patient care. Tiernan acknowl-
edged that a suit he had filed against the hospital following the ter-
mination of his employment had been dismissed and stated that at
least one of his claims had been dismissed because of a statute of
limitations problem. The trial court, Marianne O. Battani, J.,
refused to allow the defense counsel to impeach Tiernan with evi-
dence that Tiernan had been required to repeat his third year of
residency and had his employment terminated because he was
incompetent, and refused to admit the opinion and order of the
court in Tiernan's lawsuit against the hospital for the purpose of
showing that only one of the claims in that suit had been dismissed
because it was not timely. The jury returned a verdict for the plain-
tiff, awarding economic damages and damages for pain and suffer-
ing, past loss of society, and future loss of society. The hospital

moved for remittitur or for a new trial on the basis of the court's refusal to permit impeachment of Tiernan regarding his bias against the hospital and because of the alleged misconduct of the plaintiff's counsel during the course of the trial. The court denied the motion for a new trial, but granted remittitur. The defendant hospital appealed.

The Court of Appeals *held*:

1. Because bias or prejudice on the part of a witness is always relevant, evidence and testimony that touches the bias or interest of a witness is always admissible. Bias or interest can be shown on cross-examination and, if denied, can be shown on rebuttal after laying a proper foundation for such proof. The hospital should have been allowed to present evidence showing the source of Dr. Tiernan's animus against it. The trial court abused its discretion in refusing to allow the hospital to present evidence demonstrating the alleged basis of Tiernan's bias against the hospital on the basis that Tiernan's bias was evident from his demeanor and the jury did not need to know the origin of that bias. Because Tiernan made a number of uncorroborated scandalous charges against the hospital and was permitted to make himself out to be an impartial and disinterested witness, the court's refusal to permit the hospital to present evidence demonstrating why Tiernan might be biased against the hospital cannot be said to be harmless error. Accordingly, because the outcome of the trial might well have been affected by the hospital's ability to present evidence concerning Tiernan's alleged bias, the jury verdict must be reversed and the matter must be remanded for a new trial.

2. The trial court did not abuse its discretion in refusing to admit the opinion and order of the trial court in the lawsuit brought by Tiernan against the hospital. That opinion and order did not impeach Tiernan's testimony that one of the counts had been dismissed as untimely and that he did not know the basis of the dismissal of the remaining counts.

3. The trial court did not err in instructing the jury that if it found that the hospital's negligence was a proximate cause of the loss of a substantial opportunity for the decedent to survive, it could award damages for the reduction of the decedent's chance of survival. The doctrine of lost chance of survival is not a theory of recovery separate from that of the medical malpractice claim made by the plaintiff and, therefore, need not be separately pleaded.

4. The trial court erred in instructing the jury that it could infer from the hospital's failure to produce or adequately explain the absence of allegedly missing items from the decedent's medical record that such missing items would have been adverse to the

hospital. Applying the mandates of MCL 600.2146; MSA 27A.2146, SJI2d 4.12, and MCR 2.516(D)(3), it is clear that while the plaintiff is free to argue that the allegedly missing records existed and would have been favorable to her, the trial court should not instruct the jury regarding inferences to be drawn from the alleged absence of those records.

5. The trial court record substantiates the hospital's claim that the conduct of the plaintiff's counsel frequently exceeded permissible bounds, including his gratuitous interjection of the issue of race into the trial, his belittling of witnesses by the use of unsubstantiated accusations that the witnesses were lying, his use of hyperbole by suggesting that the decedent was tortured, and his relentless personal attacks on the character and integrity of the defense counsel. Although it is unnecessary to determine whether the conduct of the plaintiff's counsel would require reversal of the jury verdict, counsel should refrain from such behavior on retrial of this matter.

Reversed and remanded.

1. WITNESSES — CREDIBILITY — BIAS — RELEVANCY.

Bias or prejudice on the part of a witness is always relevant; evidence and testimony that touches the bias or interest of a witness is always admissible; bias or interest can be shown on cross-examination and, if denied, can be shown on rebuttal after laying a proper foundation for such proof.

2. ACTIONS — MEDICAL MALPRACTICE — LOST CHANCE OF SURVIVAL — PLEADING.

The doctrine of lost chance of survival is not a theory of recovery separate from that of a claim of medical malpractice and, therefore, need not be separately pleaded.

3. EVIDENCE — HOSPITAL RECORDS — JURY INSTRUCTIONS — INFERENCES.

A plaintiff in a medical malpractice action against a hospital is free to argue that records that are allegedly missing from a patient's medical chart originally did exist and would have been favorable to the plaintiff; however, a trial court should not instruct the jury that it may draw an adverse inference with respect to those records (MCL 600.2146; MSA 27A.2146; MCR 2.516[D][3]; SJI2d 4.12).

*David J. Cooper*, for the plaintiff on appeal.

*John P. Jacobs, P.C.* (by *John P. Jacobs*), for the defendant.

Before: GRIBBS, P.J., and CAVANAGH and GAGE, JJ.

PER CURIAM. A jury returned a verdict in favor of plaintiff, Karen Powell, in this wrongful death action. Defendant St. John Hospital appeals as of right the trial court order granting its motion for remittitur and denying its motion for a new trial. We reverse and remand for a new trial.

Plaintiff, as personal representative of the estate of her son, Gary Tomic, brought this action on the basis of defendant's alleged malpractice in treating Tomic.[1] Powell alleged that Tomic died because defendant's staff failed to timely diagnose and properly treat a perforation in his colon.

Tomic was hospitalized at St. John Hospital (hereinafter defendant) from October 8 to October 14, 1991, after suffering multiple seizures attributed to alcohol withdrawal. During this time, Tomic did not complain of abdominal pain.

On October 20, 1991, Tomic arrived at defendant's emergency room and reported that he had suffered severe abdominal pain during the previous five days and had been vomiting profusely during the preceding twenty-four hours. Tomic was admitted; defendant's employees administered fluids intravenously and inserted a nasogastric tube. In addition, various tests were conducted to determine the cause of his distress. These tests included a series of abdominal x-rays and a computer topography (CT) scan to discover whether "free air" was present. "Free air" is air present in the abdominal cavity, as opposed to air present in an organ, and is a sign of a perforated

---

[1] The complaint in this case was filed by Tomic's father, Milomir Tomic. However, before trial, Powell, as personal representative of Gary Tomic's estate, was substituted for Milomir Tomic.

organ. The radiologist's report on the x-rays stated that free air was not present; a radiologist's report on the CT scan was not found among Tomic's medical records.

Because Tomic had significant electrolyte abnormalities and was experiencing acute renal failure, defendant's surgeon, Dr. Robert Borchak, decided that exploratory surgery was too risky. However, after Tomic's white blood cell count dropped while his condition did not otherwise improve, Borchak performed exploratory surgery on October 21, 1991, approximately twenty-nine hours after Tomic had been admitted.

During surgery, it was determined that Tomic had diverticulosis, the formation of small pouches along the colon; furthermore, the pouches were infected, causing diverticulitis. In addition, there was an actual perforation of the sigmoid colon and peritonitis as a result of the leakage of the colon contents into the peritoneal cavity. Dr. Borchak resected the colon and also performed a decompressive enterotomy, in which he made a hole in the small bowel in order to drain fluid, then closed the hole with sutures.

On October 28, 1991, surgery was again performed on Tomic, and it was discovered that the hole made during the enterotomy had opened. As a result, small bowel contents and pus had leaked into the abdominal cavity, and four separate abscesses had formed. Tomic remained in the surgical intensive care unit (ICU) until his death on December 26, 1991, from multiple organ failure.

At trial, plaintiff claimed that the twenty-nine-hour delay in performing exploratory surgery constituted malpractice. Plaintiff presented four experts who tes-

tified that both the x-rays and the CT scan taken on October 20, 1991, showed the presence of free air. Plaintiff further asserted that performing the enterotomy had been both unnecessary and a breach of the standard of care.

Defendant maintained that Tomic had not displayed symptoms that would be expected in a person suffering from a perforated bowel, such as an elevated temperature and an abnormal white blood cell count. In fact, plaintiff's expert, Dr. David Befeler, agreed that most patients with perforations "are sicker than Gary appeared initially when he was seen in the emergency room." Accordingly, defendant argued that exploratory surgery was properly delayed until October 21, 1991, when Tomic's condition had not improved and the risk of not proceeding outweighed the risk of surgery. In addition, defendant presented testimony from both the physicians who treated Tomic and expert witnesses; these witnesses asserted that neither the x-rays nor the CT scan films revealed the presence of free air and that the treatment of Tomic had been in compliance with the standard of care.

A key witness for plaintiff was Dr. Peter Tiernan, who had been employed by defendant as a surgical resident during the period that Tomic was a patient. Tiernan began treating Tomic on November 1, 1991; however, the ultimate responsibility for Tomic's care remained with Borchak.

It was undisputed at trial that Tomic had been gay. Tiernan testified that some doctors employed by defendant were reluctant to associate with or touch homosexuals and that he heard certain physicians refer to Tomic as a "dirt bag." Members of the staff

similarly disparaged women, "people of color," and uninsured patients.

Tiernan also testified that there was a pattern of delay in treating Tomic because Borchak did not come to the hospital regularly. Tiernan further explained that when an operation was unsuccessful, subsequent surgical procedures would often be performed in the nonsterile ICU, rather than the surgery, in order to hide that fact. Tiernan stated that he and Dr. Larry Lloyd performed such a surgical procedure on Tomic in the ICU, without anesthesia, during which they removed feces and pus from Tomic's abdomen by hand while Tomic "grimaced in pain." Moreover, Tiernan asserted that he and the other surgical residents had made numerous complaints about the care given to Tomic and other patients, which were ignored by the hospital. In Tiernan's opinion, certain aspects of the treatment given to Tomic constituted "bad medicine."

Additionally, Tiernan testified that he had observed the removal of compromising documents from medical charts and that he had noticed that progress notes and reports of test results often were missing when medical charts were subsequently reviewed. Tiernan stated that a note that he recalled writing was absent from Tomic's chart.

Tiernan admitted that he had been required to repeat the third year of his residency and that, midway through the repeated year, his residency had been terminated. Tiernan asserted that he was required to repeat his third year because he repeatedly complained to the hospital administration about deficiencies in patient care. Tiernan further acknowledged that, following his termination, he had filed a

lawsuit against defendant that had been dismissed, but stated that the dismissal had been because of the expiration of the period of limitation. The trial court refused to allow defense counsel to impeach Tiernan by presenting evidence that Tiernan had been required to repeat his third year, and had been eventually discharged, because he was incompetent. In addition, the trial court refused to permit defendant to enter into evidence the trial court opinion and order dismissing Tiernan's lawsuit against the defendant for the purpose of demonstrating that only one of Tiernan's claims had been dismissed on the basis that it was not timely filed.

Lloyd denied that there had been a procedure where pus and feces had been removed from Tomic's abdomen by hand. Borchak testified that he had regularly visited his patients in the ICU, including Tomic. Defendant's doctors all stated that they had never heard staff members refer to anyone as a "dirt bag" and that treatment was never altered because of a patient's race, gender, or sexual orientation. No one except Tiernan testified that patient notes and records regularly disappeared and were sometimes deliberately destroyed. Lloyd testified that the only instance he was aware of where a note was purposely removed from a chart occurred when a senior staff member would not allow Tiernan to do "crazy things" to a patient and Tiernan became angry and wrote "inflammatory statements" in the chart.

The jury returned a verdict in favor of plaintiff, awarding $392,476.87 in economic damages, $6,700,000 for Tomic's pain and suffering, $3,150,000 for past loss of society, and $3,150,000 for future loss of society for a total award of $13,392,476.87. Defend-

ant moved for remittitur and for a new trial on the basis that the trial court erred in refusing to permit Tiernan to be questioned regarding his bias and because of the alleged misconduct of plaintiff's counsel. The trial court denied defendant's motion for a new trial; however, it granted the motion for remittitur in part and reduced the award for Tomic's pain and suffering to $3,500,000, the award for past loss of society to $1,750,000, and the award for future loss of society to $1,750,000, thus reducing the total award to $7,392,476.87.

I

Defendant first argues that the trial court erred in refusing to permit it to cross-examine Dr. Peter Tiernan to reveal his bias. A trial court's decision to admit or exclude evidence is reviewed for an abuse of discretion. *Ellsworth v Hotel Corp of America*, 236 Mich App 185, 188; 600 NW2d 129 (1999).

The credibility of a witness is an appropriate subject for the jury's consideration. *People v Coleman*, 210 Mich App 1, 8; 532 NW2d 885 (1995). Evidence that shows bias or prejudice on the part of a witness is always relevant. See *Popp v Crittenton Hosp*, 181 Mich App 662, 664; 449 NW2d 678 (1989). Accordingly, "[t]estimony . . . which touches the bias or interest of the witness[] is always admissible, and can be shown upon his cross-examination, and, if denied by him, can be proven on rebuttal; the proper foundation being laid for such proof." *Swift Electric Light Co v Grant*, 90 Mich 469, 475; 51 NW 539 (1892); see also *Foster v Krause*, 187 Mich 630, 632; 153 NW 1066 (1915) ("The testimony bore on the interest of the

witness, and was admissible for that purpose . . . .").
As our Supreme Court explained over a century ago:

> It is true that where a witness is cross-examined on mat-
> ters purely collateral, the cross-examiner cannot inquire of
> other witnesses whether the answers are truthful, because
> the inquiry would open irrelevant issues. But the interest or
> bias of a witness has never been regarded as irrelevant. It
> goes directly to his credit, and must determine with the jury
> how far facts depending on his evidence are to be regarded
> as proven. A party cannot be compelled to put up with the
> statements of a witness concerning his own interest or per-
> sonal relation to the case and parties, where it becomes
> necessary to know his position. . . . The administration of
> justice would be very defective if every witness could, with-
> out contradiction, make himself out impartial and disinter-
> ested, and run no risk of exposure. [*Geary v People*, 22
> Mich 220, 222-223 (1871).]

We conclude that the trial court abused its discre-
tion in refusing to allow defendant to present evi-
dence demonstrating the alleged basis of Tiernan's
bias against defendant.[2] The trial court believed that
because Tiernan's bias against defendant was evident

---

[2] On appeal, plaintiff argues that this issue is not preserved because
Tiernan never specifically stated that he believed he was terminated
because of his whistle-blowing activities, although he did identify those
activities as the reason he was required to repeat his third year, and
defendant never specifically asked him why he had been terminated. We
believe that plaintiff's distinction between the repetition of a year of train-
ing and the ultimate dismissal is unduly technical. At trial, Tiernan denied
that he had been told that he had been fired because of his incompetence.
Furthermore, plaintiff's counsel elicited from Tiernan a catalogue of the
complaints that the latter had made, then immediately asked, "Were you
fired?," and Tiernan responded affirmatively. The impression left is that
Tiernan was fired because he refused to keep quiet about the hospital's
lapses in patient care. Defense counsel informed the court that he wanted
to introduce evidence regarding Tiernan's termination because it was rele-
vant to his motive or bias and made an offer of proof that Dr. Lloyd would
have testified that Tiernan's termination was due solely to his "lack of per-
formance and his inability to function as a third- or fourth-year resident in

from his demeanor, the jury did not need to know the origin of that bias. We find this reasoning to be flawed. The only evidence presented to the jury concerning Tiernan's animus against defendant was Tiernan's own testimony. Tiernan stated that the hospital was poorly managed and provided substandard care to patients and, furthermore, that it had dismissed him when he repeatedly complained about these problems. If these allegations were the sole basis for Tiernan's hostility toward defendant, the jury would have had little reason to doubt his testimony regarding Tomic's care and the disappearance of records from patient files. If, however, the jury believed that defendant had dismissed Tiernan for incompetence, it could easily have concluded that Tiernan's testimony, or at least his more inflammatory charges, had been fabricated in an attempt to pay back defendant for derailing his surgical career.[3]

We cannot conclude that the trial court's error was harmless. Without Tiernan's testimony, this case was a routine "battle of the experts." However, Tiernan made scandalous charges, not corroborated by any other witness, regarding the alleged biases against homosexuals, women, and "people of color" displayed by defendant's employees; appalling lapses in patient care, including the care given to Tomic; and the deliberate destruction of patient records to cover up wrongdoing. By the trial court's refusal to allow defendant to present evidence concerning the true reason for Tiernan's termination, Tiernan was permit-

---

a general surgery residency training program." We conclude that this issue is sufficiently preserved.

[3] Tiernan testified that he was currently in general practice in California.

ted "to make himself out impartial and disinterested," *id.*, a righteous doctor whose only concerns were for justice and patient care. Indeed, when plaintiff's counsel asked Tiernan why he was testifying, the latter replied, "Justice and conscience," and further cited his duties as a physician and as a military officer. Because the outcome may well have been affected by defendant's inability to present evidence concerning a different motivation for Tiernan's testimony, the jury verdict must be reversed and defendant given a new trial.

II

We briefly address several other issues raised by defendant on appeal, because they may recur at a new trial.

A

The trial court did not abuse its discretion in refusing to admit the trial court opinion and order dismissing Tiernan's lawsuit against defendant. The opinion and order do not indicate that a judicial finding was made that Tiernan had been dismissed on the basis of incompetence. Moreover, the opinion and order were not admissible to impeach Tiernan because he accurately stated that one claim had been dismissed because it was filed too late, and he testified that he did not know the basis for the dismissal of the remaining claims. Finally, after reviewing the opinion and order, we find no corroboration of defendant's claim that Tiernan was assessed $76,000 in costs and sanctions in that lawsuit.

B

The trial court did not err in instructing the jury that, should it find that defendant's negligence was a proximate cause of the loss of a substantial opportunity for Tomic to survive, it could award damages for the reduction in his chance of survival. Defendant's own witnesses provided testimony that Tomic's chances of survival had been diminished because of various factors. Contrary to defendant's argument, the lost chance of survival doctrine is not a separate theory of recovery from plaintiff's medical malpractice claim, and, therefore, plaintiff was not required to plead it. See *Falcon v Memorial Hosp*, 436 Mich 443, 461-462, 469; 462 NW2d 44 (1990) (LEVIN, J.), 472-473 (BOYLE, J.) (holding that the loss of the opportunity to survive is compensable in medical malpractice actions, provided that the negligence of the defendant, more probably than not, caused the loss of opportunity).

C

At trial, plaintiff repeatedly asked why Tomic's records did not contain a report from the CT scan performed on October 20, 1991. Plaintiff argued that a report had been completed and charged that defendant had destroyed it because it noted the presence of free air.[4] In addition, plaintiff made multiple refer-

---

[4] Defendant acknowledged that the radiologist should have prepared a report concerning the results of the CT scan, but argued that, for unknown reasons, this had not occurred. No one testified that a report on the CT scan had actually been seen. Dr. Akash Sheth, the surgical resident, recalled personally reviewing the film with one of the radiologists, although he could not recall which one, and Tomic's medical records contained a note confirming that the consultation occurred.

ences to the "missing" guaiac tests. During Tomic's
first hospitalization from October 8 to October 14,
1991, an order for three guaiac stool tests was
included in his chart. However, there was nothing in
the chart indicating that the tests had been done.[5]
Plaintiff's theory was that the tests had been per-
formed and showed the presence of blood in Tomic's
stool and that defendant had subsequently destroyed
the records because its failure to follow up on the
test results was negligent.

At plaintiff's request, the trial court, using a slightly
modified version of SJI2d 6.01(c), instructed the jury
as follows:

> The defendant in this case has not offered the CAT scan
> report, Dr. Tiernan's report, and the guaiac stool reports, if
> they exist. As this evidence was under the control of the
> defendant and could have been produced by it, you may
> infer that the evidence would have been adverse to the
> defendant, if you believe that no reasonable excuse for
> defendant's failure to produce the evidence has been
> shown.

Defendant argues that the trial court erred in giving
this instruction. We agree. MCL 600.2146; MSA
27A.2146 provides in pertinent part, "The lack of an
entry regarding an act, transaction, occurrence, or
event in a writing or record so proved may be
received as evidence that the act, transaction, occur-
rence, or event did not, in fact, take place." SJI2d 4.12
states, "The committee recommends that no instruc-

---

[5] Dr. Jennifer Appleyard, who treated Tomic during his first hospitaliza-
tion, testified that Tomic may not have had a stool to be tested. In the
alternative, it was possible that the test results had not been recorded or
had been lost.

tion be given concerning hospital and business records." MCR 2.516(D)(3) provides:

> Whenever the sʲɪ committee recommends that no instruction be given on a particular matter, the court shall not give an instruction on the matter unless it specifically finds for reasons stated on the record that
>
> (a) the instruction is necessary to state the applicable law accurately, and
>
> (b) the matter is not adequately covered by other pertinent standard jury instructions.

Our Supreme Court reconciled these three provisions in *Siirila v Barrios*, 398 Mich 576, 594-597; 248 NW2d 171 (1976).[6] The *Siirila* Court held that, while counsel was free to argue the issue, the trial court properly refused to instruct the jury that the absence of a hospital record could be considered as evidence that an event had not taken place. Applying *Siirila* and the above provisions to the instant case, we conclude that the trial court erred in giving the modified adverse inference instruction. At retrial, plaintiff is free to argue that the missing records existed and would have been favorable to her. However, the trial court should not provide an instruction regarding the records.

D

Finally, we address defendant's claim that the trial was tainted by the improper conduct of plaintiff's counsel. We recognize that this case has controversial aspects and that the trial was hotly contested; how-

---

[6] In *Siirila*, the Supreme Court actually addressed SJI 2.12 and GCR 1963, 516.6(3), the predecessor versions of SJI2d 4.12 and MCR 2.516(D)(3).

ever, in such situations, the importance of profes-
sional courtesy and civility increases exponentially.
Here, after carefully reviewing the record, we must
agree with defendant that the conduct of plaintiff's
counsel frequently exceeded permissible bounds.[7]
Because we have already determined that defendant
is entitled to a new trial, we need not determine
whether the inappropriate behavior of plaintiff's
counsel, standing alone, would require reversal of the
jury verdict. However, we admonish plaintiff's coun-
sel to refrain from the inappropriate actions dis-
cussed below in the future.

Plaintiff's counsel twice gratuitously inserted the
issue of race into the trial. Counsel's emphasis on the
alleged prejudice at the hospital, exemplified by his
statement that he was "standing up to defend against
prejudice," the accusation that defense counsel was
"act[ing] on prejudice," and the reminders that
defendant's employees allegedly referred to certain
classes of people as "dirt bags" reflect a deliberate
strategy to incite the jurors to punish defendant for
its bigotry, rather than to carefully consider the facts
of the case.[8] See *Joba Constr Co, Inc v Burns & Roe,
Inc*, 121 Mich App 615, 637; 329 NW2d 760 (1982).

---

[7] The trial court denied plaintiff's motion in limine to exclude refer-
ences to the theories propounded by two defense experts regarding a pos-
sible cause of Tomic's perforated colon. We think it likely that the denial
of this motion contributed to the unfortunate tone of the trial. Because
there appears to be no dispute that the cause of the perforation was irrel-
evant to the issue whether Tomic was treated properly, we believe that
the trial court would do well to reconsider the admissibility of the defense
experts' theory on remand.

[8] The comments about the homophobia allegedly prevalent at the hos-
pital were based on Tiernan's testimony. It was undisputed that Tomic had
been gay. Accordingly, if Tomic were not given treatment that complied
with the standard of care because of his sexual orientation, that fact
would be relevant. However, while Tiernan testified that some staff mem-

Moreover, counsel regularly accused witnesses of fabricating their testimony; charges that defense witnesses were "making up" what they were saying were plentiful. Such conduct does not constitute proper advocacy. Counsel is not entitled to belittle a witness or to make unsubstantiated accusations that the witness is lying.[9] *Badalamenti v William Beaumont Hosp*, 237 Mich App 278, 290-291; 602 NW2d 854 (1999); *Shemman v American Steamship Co*, 89 Mich App 656, 667; 280 NW2d 852 (1979).

In addition, counsel indulged in inappropriate hyperbole by repeatedly saying that Tomic "was tortured." Indeed, at one point plaintiff's counsel said that Tomic "literally was tortured." The word "torture," when used as a verb, signifies the deliberate infliction of severe pain.[10] Although Tomic undoubt-

---

bers were unconcerned about delays in Tomic's postoperative treatment because he was gay, Tiernan attributed the delays themselves to the senior staff's lengthy absences from the ICU. There was no evidence that the approximately twenty-nine-hour delay in performing exploratory surgery on Tomic occurred because of his sexual orientation; likewise, there is no evidence that the surgeon decided to perform the enterotomy because Tomic was gay.

[9] Defendant also complains that plaintiff's counsel leveled pervasive allegations of dishonesty against it. However, Tiernan's testimony provided an evidentiary foundation for counsel's charges that defendant destroyed or suppressed records to cover up the alleged malpractice. Tiernan testified that he had witnessed the removal of compromising documents from medical charts, he had noticed that notes and reports were often missing when he later reviewed a medical chart, and a note that he had written was missing from Tomic's chart. On the basis of this testimony, it was appropriate for plaintiff's counsel to argue that defendant had attempted to cover up its malpractice by destroying records.

[10] The *Random House Webster's College Dictionary* defines "torture" as follows:

> *n.* 1. the act of inflicting excruciating pain, as punishment or revenge, as a means of getting a confession or information, or for sheer cruelty. 2. a method of inflicting such pain. 3. Often, *tortures.* the pain or suffering caused or undergone. 4. extreme anguish of

edly suffered greatly during his hospitalization, there is nothing in the record to indicate that any of his agony was intentionally inflicted.[11] See *Means v Jowa Security Services*, 176 Mich App 466, 477; 440 NW2d 23 (1989). While the jury may have recognized that counsel was engaging in hyperbole, the use of the word should be avoided on retrial. See *Firchau v Foster*, 371 Mich 75, 78; 123 NW2d 151 (1963); *Elliott v A J Smith Contracting Co, Inc*, 358 Mich 398, 418-420; 100 NW2d 257 (1960).

Finally, we agree with defendant that counsel's relentless attacks on defense counsel were completely improper. The objections of plaintiff's counsel were regularly accompanied by charges that defense counsel was "lying" or "misrepresenting" something or "making things up." Plaintiff's counsel asked a defense witness, "Was it you or Mr. Arnone that came up with . . . this?" and stated in closing argument, "Of course, Mr. Arnone would go and say anything." The record does not support the claim that defense counsel "act[ed] on prejudice." Likewise, there is nothing in the record to support the speculation of plaintiff's counsel that defense counsel "and his cronies go to football games and laugh about what they're going to say about Gary Tomic." Lastly, counsel repeatedly and inappropriately assigned blame to defense counsel for defendant's alleged misdeeds. Needless to say, there is no support in the record for the charges that

---

body or mind; agony. 5. a cause of severe pain or anguish. —*v.t.* 6. to subject to torture. 7. to afflict with severe pain of body or mind. 8. to twist, force, or bring into some unnatural shape.

[11] Even Tiernan, whose testimony was generally hostile to defendant, stated that he would not equate the medical treatment given to Tomic with "torture."

*defense counsel* "literally killed Gary Tomic" and then "destroy[ed] records."[12]

Reversed and remanded for a new trial. We do not retain jurisdiction.

---

[12] Our Supreme Court has stated:

"One attack [abusing opposing counsel] may not constitute prejudicial error, but where there are many improper remarks concerning counsel for the defense they may, in the aggregate, prove so prejudicial as to require a new trial." [*Wayne Co Bd of Rd Comm'rs v GLS LeasCo*, 394 Mich 126, 131; 229 NW2d 797 (1975), quoting 58 Am Jur 2d, New Trial, § 69, pp 258-259.]