# S T A T E   O F   M I C H I G A N

# C O U R T   O F   A P P E A L S

---

LONETTA NICOLE SILAS, Individually and as
Next Friend of MICHAEL HALL, JR.,

      Plaintiffs-Appellees,

and

STAR BRIGHT IMAGE GROUP, LLC, and
NORTH SHORE INJURY CENTER,

      Intervening Plaintiffs,

v

SECURA INSURANCE COMPANIES, doing
business as SECURA INSURANCE COMPANY,

      Defendant-Appellant,

and

GARY THOMAS FENTON,

      Defendant.

UNPUBLISHED
October 10, 2017

No.   331169
Wayne Circuit Court
LC No.   13-010712-NF

---

Before:  SAAD, P.J., and SERVITTO and GADOLA, JJ.

PER CURIAM.

      This matter arises from an automobile accident that occurred on December 10, 2012. After an eight-day trial, a jury awarded plaintiff Lonetta Nicole Silas nearly $7 million in damages against defendant Secura Insurance Companies (Secura).  On appeal, Secura argues that numerous errors occurred during trial that prejudiced Secura and warrant a new trial.  We agree that several errors occurred during trial, the cumulative effect of which unfairly prejudiced Secura.  We therefore reverse and remand for a new trial.

# I. BACKGROUND OF THE CASE

On December 10, 2012, Silas was involved in an automobile accident. At trial, various witnesses gave differing accounts of the accident. However, all of the witnesses agreed that a Ford Taurus, driven by defendant Gary Fenton, struck a Ford Ranger, driven by Dobilas Matulionis, which then struck the vehicle occupied by Silas, a Chrysler 300C. Secura insured the owner of the Chrysler 300C and initially paid personal protection insurance (PIP) benefits to Silas. Following the accident, Secura asked Silas to attend several independent medical examinations (IMEs). The doctors who performed these IMEs all reached the conclusion that Silas was not injured to any significant extent as a result of the accident. After receiving reports from these doctors, Secura suspended Silas's benefits.

Silas filed suit against Secura and Fenton. While her claim against Fenton ultimately settled for the limit of his insurance policy, Silas's claim against Secura did not settle. Against Secura, Silas sought unpaid PIP benefits. She also sought to recover under the underinsured motorist (UIM) provision of the policy, which provided $1 million in coverage. With regard to this provision, Silas contended that Fenton was an underinsured motorist because his policy did not fully compensate her for her injuries. At trial, Silas presented several experts who testified that Silas suffered significant injuries as a result of the accident. Secura presented its own experts, who opined that Silas was not injured to any significant degree during the accident, and that she was grossly overstating the extent of her injuries. The jury concluded that Fenton was at fault for the accident and awarded Silas over $500,000 in PIP benefits and interest and over $6 million in benefits under the UIM portion of the policy. After several post-trial motions, the trial court reduced the UIM award to $900,000 to conform to the UIM policy language[1] and to remove a portion of the award that was duplicative. Ultimately, Silas was awarded approximately $1.66 million in damages, interest, taxable costs, and attorney fees.

# II. DISCUSSION

On appeal, Secura argues that numerous instances of error occurred during trial that prejudiced Secura and warrant a new trial. We agree with Secura regarding three of the asserted errors; namely, that Silas's trial counsel committed numerous acts of misconduct during trial, that the trial court abused its discretion by admitting evidence at trial of Silas's settlement with Fenton, and that the trial court abused its discretion by excluding the testimony of Secura's proposed vocational rehabilitation expert, Marcy Slabey-Klar. We conclude that the cumulative effect of these errors unfairly prejudiced Secura and that a new trial is therefore warranted.

---

[1] Under the policy, Secura agreed to pay up to $1 million in UIM benefits. However, this amount would be reduced by the amount recovered from other sources. In this case, because Fenton's insurer paid $100,000 to Silas, Secura was obligated to pay, at most, $900,000 under the UIM portion of the policy.

## A.  ATTORNEY MISCONDUCT

Secura first contends that Silas's counsel engaged in numerous instances of misconduct during trial that unfairly prejudiced Secura.  Secura's argument pertains to several comments made by Silas's counsel during his opening statement, and later, during closing arguments.  During counsel's opening statement, he discussed Silas's interactions with the doctors who performed the IMEs.  This discussion, however, turned into an argument that these doctors were biased and not credible.  Secura's counsel objected on the basis that counsel had "crossed the line into argumentation."  The trial court sustained the objection and instructed counsel to refrain from arguing the case during opening statement.

"What constitutes a fair opening statement is largely a matter addressed to the trial court's discretion." *Taylor v Klahm (After Remand)*, 40 Mich App 255, 261; 198 NW2d 715 (1972).  The trial court properly responded to Secura's objection.  Secura requested no other relief at the time and seemed to accept the trial court's handling of the matter as appropriate.  If this were the only concern, no further relief would be warranted.  See *People v Carter*, 462 Mich 206, 219-220; 612 NW2d 144 (2000) (a party that acquiesces to the trial court's treatment of an issue waives the issue on appeal).

However, that is not the case.  Secura also points to a number of inflammatory comments made by counsel during closing argument.  With regard to these comments, we first address whether Secura's claims were properly preserved, and the effect of that decision on our review of the issue.  Silas correctly notes that Secura did not object to these comments and did not move for a mistrial on the basis of these comments in the trial court.  Secura failed to object and request a corrective instruction, or alternatively, move for a mistrial, so the issue is not preserved. *Reetz v Kinsman Marine Transit Co*, 416 Mich 97, 102-103; 330 NW2d 638 (1982).  But to the extent Silas implies that this precludes review of the issue on appeal, she is incorrect.  As our Supreme Court explained in *Reetz*:

> Reetz contends that the Court of Appeals should not have considered any of the claimed errors because they were not properly preserved for appellate review.  The cases cited by Reetz in support of this argument stand for the proposition that a litigant has no *right* to appellate review unless he has requested a curative instruction or made a motion for mistrial.  Nevertheless, the rule is not an absolute bar to review, for it does not preclude an appellate court from correcting substantial errors which were not preserved in the trial court.

> Our prior cases have clearly stated that incurable errors are not shielded from appellate review because an attorney fails to request what in that case would be a futile instruction.  The "no objection—no ruling—no error presented" rule requires counsel to seek to have error cured before the case is submitted to the jury.  When a cure is not feasible, that rule need not be invoked.  Where improper conduct by one or both parties influences the outcome of a trial, an appellate court may reverse although the appellant's attorney did not seek to cure the error.

> Some of our earlier cases have indicated that if an error is incurable, the party claiming prejudice should move for a mistrial.  Although such a motion is

appropriate, it is not mandatory. A party may have such an investment in time and money in a trial at the point when incurable error arises that he would rather see the case go to the jury, hoping that the jurors will be able to ignore the improper argument. Such a decision is eminently reasonable, both for the individual litigant and the judicial system as a whole. A trial which has consumed valuable private and public resources need not be aborted because the jury *may* have been improperly influenced or distracted by closing argument.

When reviewing an appeal asserting improper conduct of an attorney, the appellate court should first determine whether or not the claimed error was in fact error and, if so, whether it was harmless. If the claimed error was not harmless, the court must then ask if the error was properly preserved by objection and request for instruction or motion for mistrial. If the error is so preserved, then there is a right to appellate review; if not, the court must still make one further inquiry. It must decide whether a new trial should nevertheless be ordered because what occurred may have caused the result or played too large a part and may have denied a party a fair trial. If the court cannot say that the result was not affected, then a new trial may be granted. Tainted verdicts need not be allowed to stand simply because a lawyer or judge or both failed to protect the interests of the prejudiced party by timely action. [*Id*. at 100-103 (footnotes omitted).]

"While a lawyer is expected to advocate his client's case vigorously, parties are entitled to a fair trial on the merits of the case, uninfluenced by appeals to passion or prejudice." *Badalamenti v William Beaumont Hosp-Troy*, 237 Mich App 278, 292; 602 NW2d 854 (1999) (quotation marks and citations omitted). "As long as attorneys will resort to such methods, unjustifiable either in law or ethics, courts have no alternative but to set the verdicts aside." *Id*. (quotation marks and citations omitted). That said, "[a]n attorney's comments usually will not be cause for reversal unless they indicate a deliberate course of conduct aimed at preventing a fair and impartial trial." *Hunt v Freeman*, 217 Mich App 92, 95; 550 NW2d 817 (1996). Reversal is required when an attorney's comments "reflect a studied purpose to inflame or prejudice a jury or deflect the jury's attention from the issues involved." *Id*.

Secura points to two arguments made by Silas's counsel during his closing argument. First, counsel contended that he had uncovered a conspiracy perpetrated by Secura and Matulionis. Counsel argued that Secura's attorney now represented Matulionis and had coached Matulionis into providing false testimony regarding the circumstances of the accident in order to prevent Silas from recovering UIM benefits. Second, counsel argued that Secura had improperly "broken into" Silas's Facebook account to obtain a photograph. Counsel suggested that the only purpose behind this act was to discover Silas's race, thereby implying that Secura's decision to stop paying Silas's benefits was the result of racial animus.

We conclude that both arguments were improper. It is certainly appropriate for an attorney to argue that, based on facts in evidence, a particular witness is not credible. See *Reetz*, 416 Mich at 108-109. But in this case, counsel's argument had no factual basis whatsoever. With regard to the claim of a conspiracy, counsel's argument apparently derives from the following exchange between Matulionis and Silas's counsel:

*Q.* Today, you are here with your attorney over there right?

*A.* He is not my attorney.

*Q.* Mr. Plum is not your attorney?

*A.* No[.]

*Q.* Okay, who told you to come here today?

*A.* I was subpoena[ed].

*Q.* Did you have a conversation with any lawyer?

*A.* Yes.

*Q.* Which lawyer did you have a conversation with?

*A.* Mike Ryan.

*Q.* This defense attorney? How is it that Mr. Rick Plum is in the courtroom. Isn't this the guy who represented you at the deposition?

*A.* Yes.

*Q.* All [r]ight. He was the lawyer at your deposition?

*A.* Yes.

*Q.* Okay. A[n]d he is here now?

*A.* Yes.

*Q.* Okay. So—

*A.* He is not my attorney today.

*Q.* Oh, he is not your attorney today. He just happens to be in the courtroom[.]

*A.* That's correct.

*Q.* Let me show how you testify about the weather here my question to you on May 19, 2014, do you know if it was changing lane, Answer "…no it was not changing lane [sic]." Did I read that correctly?

*A.* Yes.

*Q.* No other questions. Thank you.

During closing argument, Silas's counsel extrapolated from this exchange that Secura's counsel had, before trial, become Matulionis's attorney, and had conspired with him to provide false testimony that would mislead the jury into believing that Fenton was not at fault. There was no basis for these claims. Matulionis never testified that he was now represented by Secura's counsel. The record only demonstrates that Matulionis spoke with Secura's counsel, a fact that is hardly surprising given that Matulionis was a witness who would be testifying at trial. The content of this conversation is unknown. Nor was it clear that Matulionis changed his testimony from how he testified at his deposition. Counsel only confirmed that at his deposition, Matulionis stated, "no it was not changing lane [sic]." No context was given for this statement. It is entirely unclear whether "it" referred to the cause of the accident or some other circumstance, such as whether Matulionis or Fenton had changed lanes at some point, or perhaps another vehicle on the road that day. Regardless, counsel vociferously contended that a conspiracy had been perpetrated by Secura's counsel and Matulionis to mislead the jury. Counsel cut this theory out of whole cloth. Compounding the error, counsel then asked the jury to punish Secura for engaging in this purported conspiracy by asking the jury not to "let them get away with that."

The record also demonstrates that counsel's effort was not a one-time occurrence. Rather, counsel planted the seed for this claim in the minds of the jurors immediately after Matulionis completed his testimony. Shortly after Matulionis was excused, and in full view of the jury, Silas's counsel commented, "There is so much insurance fraud it is unbelievable."[2] One could certainly infer that this comment was aimed at priming the jury for the closing argument that would follow.

More troubling, however, was counsel's blatant attempt to convince the jury that Secura stopped paying benefits to Silas because, using illegal methods, it discovered that she was African-American. At trial, it was shown that Secura's investigators had obtained a photograph of Silas from her Facebook page. Trista Strohaver, a claims adjuster, explained that obtaining such a photograph was a routine exercise when Secura's "SIU Department" investigated a claim.[3] In his closing argument, Silas's counsel contended that Silas's Facebook account had been set to "private" and that the only way to obtain this photograph was by "break[ing] in" to the account. We have found no record evidence that Silas's Facebook account had been set to private.[4] Nor was there any evidence suggesting that the photograph was, or must have been,

---

[2] This comment prompted the trial court to immediately instruct counsel to refrain from making such commentary.

[3] Strohaver later testified, "For social media we send it to our SIU unit who does a social media search, which could include Facebook, Twitter, Instagram, anything in the social media."

[4] During his examination of Strohaver, Silas's counsel asked if Secura's policy authorized it to access Silas's "private Facebook account," and whether Strohaver knew who accessed Silas's "private Facebook account[.]" Strohaver answered that the policy did not authorize such activity, and that "[i]f it was done, it would be our SIU unit." Strohaver's testimony does not confirm that Silas's account was made private, and counsel's questions are not evidence of that fact. See *People v Mesik (On Reconsideration)*, 285 Mich App 535, 541; 775 NW2d 857 (2009).

obtained by "breaking in" to Silas's Facebook page. Counsel's contention that Secura "broke into" Silas's Facebook page was entirely baseless.

Counsel then suggested to the jury that Secura retained the photograph to document Silas's race, thereby implying that its decisions were racially motivated. There was absolutely no basis for suggesting that Secura's decisions were motivated by racial animus. That Secura was in possession of a photograph of Silas, who happened to be African-American, in no way demonstrated that Secura was a racist company, as Silas's counsel clearly suggested to the jury.[5] And once again, this was not a one-time occurrence. Rather, counsel planted this idea in the jury's collective mind during his examination of Strohaver. Counsel first asked Strohaver if there was anything about Silas that she or Secura did not like that caused Secura to suspend Silas's benefits. Strohaver answered, "No." Counsel then asked, "Is there anything about her race?" Strohaver again answered, "No." Particularly in light of Strohaver's response to the first question, counsel's second question was a gratuitous attempt to cast Secura as a racist company. Counsel's closing argument followed up on the theme.

Counsel's arguments were improper. In *Powell v St John Hosp*, 241 Mich App 64, 79; 614 NW2d 666 (2000), this Court admonished an attorney for "twice gratuitously insert[ing] the issue of race into the trial." This Court found that counsel's conduct "reflect[ed] a deliberate strategy to incite the jurors to punish defendant for its bigotry, rather than to carefully consider the facts of the case." *Id*. Here, too, counsel clearly and unabashedly suggested that the jury should conclude that Secura was a racist company. This was a deliberate attempt to distract the jury from the facts of the case, and instead, incite it to punish Secura for its purported racial animus. Counsel's commentary exceeded the bounds of proper argument.[6]

Having concluded that the counsel's comments were improper, we must consider whether the comments were harmless or whether they resulted in unfair prejudice to Secura. *Reetz*, 416 Mich at 102-103. On this point, we find guidance in *Reetz*. In *Reetz*, the plaintiff's attorney made several comments during closing argument stressing that the defendant, a corporation, was "an unfeeling, powerful corporation controlled by a ruthless millionaire." *Id*. at 111. Although the precise arguments made by counsel in this case are of a different sort, Silas's counsel sought

---

If anything, this exchange would seem to show a subtle attempt by counsel to mislead the jury by interjecting a fact for which there was no evidence into the trial.

[5] In her brief on appeal, Silas contends that she "asked the jury to make their own conclusion about the Facebook pictures." And in truth, in discussing why the photograph was contained in Secura's claims file, counsel did ask the jury to "be the judge of that." This comment, however, was prefaced by the question, "Was it because of her race[,]" and followed by the comment, "The only thing those pictures show is she's an African American woman, nothing else." Only the most naïve would have been oblivious to the point being made by Silas's counsel.

[6] There would have been, of course, a perfectly legitimate non-racial justification for Secura to research Silas's social media accounts. The primary issue in this case involved the extent of Silas's injuries. Photographs and commentary on Silas's social media platforms might tend either to support or disprove the claim that she had suffered significant and ongoing injuries as a result of the crash.

to paint Secura as an unfeeling corporation and described Secura as a racist company that had conspired to prevent a black woman from obtaining benefits to which she was entitled. Certainly, such an argument would have a similar effect as that found in *Reetz*: "Even a juror who [otherwise] harbored no prejudice against" Secura "might have been swayed by these inflammatory remarks to alter his view of the evidence." *Id*.

And ultimately, this case turned on credibility determinations. Both sides presented expert witnesses, who came to opposing conclusions regarding whether Silas suffered injuries as a result of the accident. There was also conflicting evidence regarding how the accident occurred. In a trial such as this, inflammatory comments aimed at causing the jury to harbor animosity toward one particular party could sway the jury to reach a particular verdict not based on the evidence, but rather, based on its view of the parties themselves. It is also worth noting that counsel's final statement to the jurors asked them to "[t]ell Lonetta Silas that she's an honorable woman. Praise the Lord." This was yet another attempt to take the focus away from the relevant factual determinations, and instead, turn the case into a battle between good and evil.[7] Counsel asked the jury to make its determinations based on its perception of the moral character of each party, not on the facts and law applicable to the case.

Given the lack of any objection by Secura, however, the question remains whether the misconduct of Silas's counsel entitles Secura to a new trial. In *Reetz*, 416 Mich at 103, our Supreme Court explained that reviewing courts

> must decide whether a new trial should nevertheless be ordered because what occurred may have caused the result or played too large a part and may have denied a party a fair trial. If the court cannot say that the result was not affected, then a new trial may be granted. Tainted verdicts need not be allowed to stand simply because a lawyer or judge or both failed to protect the interests of the prejudiced party by timely action.

Given the lack of objection or motion by Secura, the question generally turns on whether the errors could have been cured by a proper instruction. See *id*. at 101-102 (explaining that "incurable errors are not shielded from appellate review because an attorney fails to request what in that case would be a futile instruction. The 'no objection—no ruling—no error presented' rule requires counsel to seek to have error cured before the case is submitted to the jury. When a cure

---

[7] On a similar theme, counsel argued that Secura "wanted [Silas] to suffer because if you're suffering you cut and run. She didn't cut and run. She fought this giant. This is a David and Goliath match up." Although Secura does not raise the point on appeal, we also find that counsel's contention that Secura wanted Silas to suffer, which appears to be based solely on the fact that Secura suspended Silas's benefits, was itself improper. See *Powell*, 241 Mich App at 80-81 (finding improper an argument that a hospital "tortured" the plaintiff improper where there was no evidence that "any of his agony was intentionally inflicted."). Simply put, the mere fact that Secura suspended benefits after receiving multiple reports from medical experts concluding that she was not injured as a result of the accident does not support counsel's contention that Secura wanted Silas to suffer.

-8-

is not feasible, that rule need not be invoked."). In *Reetz*, our Supreme Court explained that when an improper "theme is constantly repeated so that the error becomes indelibly impressed on the juror's consciousness, the error becomes incurable and requires reversal." *Id*. at 111. In this case, Silas's counsel made numerous improper remarks during his closing argument, and these remarks were foreshadowed by several improper comments during trial. Given the repeated and inflammatory remarks by counsel throughout trial, we find it doubtful that an instruction alone would have cured the effect of the error.

## B. EVIDENTIARY ERROR

Next, we agree with Secura that the trial court abused its discretion by admitting evidence of Silas's settlement with Fenton.[8] Before trial, Secura filed a motion in limine seeking to exclude evidence that Silas had settled her claims against Fenton, arguing that evidence of the settlement was irrelevant and that any probative value was outweighed by the danger of unfair prejudice. Silas argued in response that evidence of the settlement was relevant to show that she complied with the conditions of Secura's UIM policy, which required her to exhaust the limits of any other applicable policy before she was entitled to recover benefits under Secura's policy. Silas also contended that the settlement was relevant because Secura was entitled to a setoff for the amount already paid by Fenton's insurer.

At a hearing on the motion, counsel for Secura argued that if the jury was informed that Fenton's insurer had agreed to pay Silas the limits of his insurance policy, the jury would conclude that Fenton was at fault in the accident. The trial court ultimately denied Secura's motion to exclude the evidence, explaining, however, that if the parties could reach a stipulation and provide an appropriate jury instruction explaining how to consider the stipulation, only the stipulation would be admitted at trial.

On the first day of trial, counsel for Secura explained that he provided the trial court with a proposed stipulation concerning the exhaustion of Fenton's insurance policy. Secura's counsel contended that it would not be appropriate to disclose the amount of Fenton's settlement or the limit of the UIM benefit under Secura's policy, but rather to allow the jury to determine the amount of Silas's damages, then have the court apply the UIM policy language to determine what amount Silas was entitled to receive. Silas's counsel disagreed, arguing the following:

> *Mr. Dedvujak (Silas's Counsel)*: To say he exhausted the limit, they're gonna [sic] say well, what's the limit? How do we know she didn't get enough? How do we know we should give her more?

> *The Court*: Because they're only—they're to make a determination of the total damages. Irregardless [sic], of what has been paid, or not been paid, that was for the Court to, you know, calculate afterwards. And to be part of the Jury instruction. Why not that?

---

[8] We review for an abuse of discretion a trial court's decision to admit contested evidence. *Augustine v Allstate Ins Co (After Remand)*, 292 Mich App 408, 424; 807 NW2d 77 (2011).

*Mr. Dedvujak*: I'd have to see the specific instruction in order for me to agree to that kind of a (indiscernible)[.]

Ultimately, the trial court ruled as follows:

> The Court's ruling stands in that, that it is going—can be the settlement. A settlement amount come in to pay to Silas [sic]. But it would be used for the limited purposes of . . . meeting with condition precedent on the—under the contract [sic]. And that it is exhausted, Fenton's policies, benefits have been exhausted. But it will not be used for any determination of fault.

In its final instructions to the jury, the trial court stated, "The fact that Gary Fenton's insurer paid plaintiff Lonetta Nicole Silas was received into evidence for a limited purpose for showing his policy was exhausted is one of the conditions precedent for underinsured motorist benefit coverage under SECURA insurance policy [sic]. You must not consider this evidence for any other purpose."

The trial court abused its discretion by admitting evidence of Silas's settlement with Fenton, as that settlement was irrelevant to the questions before the jury. MRE 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." All relevant evidence is admissible unless prohibited by the state or federal constitutions or by other court or evidentiary rules. MRE 402. Even when evidence is relevant, if may nonetheless be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." MRE 403.

The ultimate question at trial was whether Silas was entitled to benefits under the UIM portion of Secura's policy. To establish her entitlement to UIM benefits, Silas needed to prove that Fenton was at fault for the accident, that his negligence caused her damages, and that his insurance policy did not fully compensate her for her injuries. As Secura repeatedly argued, however, assuming the jury reached the question of damages, the trial court could simply apply the UIM policy language as a matter of law to determine how much Silas was entitled to recover under the policy. This would have been an easy task; the trial court would simply award Silas the amount by which the award exceeded Fenton's policy limit of $100,000, up to the limit of Secura's policy. There was no need for the jury to determine whether Fenton's policy limit was exhausted, and that fact was not in dispute. Indeed, the verdict form never asked the jury to make this determination. Accordingly, evidence that Fenton settled with Silas was not relevant to any of the issues before the jury and should have been excluded under MRE 401.

Generally, evidentiary errors are not a basis to vacate, modify, or otherwise disturb a judgment unless declining to take such action would be inconsistent with substantial justice. *Miller v Hensley*, 244 Mich App 528, 531; 624 NW2d 582 (2001). We acknowledge that the trial court gave a limiting instruction that directed the jurors to consider the settlement evidence only for the purpose of determining whether Silas had satisfied a condition precedent to obtaining UIM benefits under Secura's policy, and that jurors are generally presumed to follow their instructions. See *Zaremba Equip, Inc v Harco Nat'l Ins Co*, 302 Mich App 7, 25; 837

NW2d 686 (2013). We are troubled, however, by the following commentary of Silas's counsel, which he offered the jury during his rebuttal argument:

> They talk about money now. They're suggesting this case is worth less than $100,000. The Court's going to offset $100,000 that Fenton's insurance company paid her. If she gets less than $100,000, she touches none of that money. That ought to really get you riled up that they did that and didn't tell [y]ou why they were doing that. I'm telling you why. They want you to reduce her right to compensat[ion] as much as possible so they get away with not paying. That's what this is about.

This commentary demonstrates that Silas's counsel relied on evidence of the settlement agreement with Fenton to attempt to convince the jury to award Silas an amount of damages exceeding $100,000 to ensure that Secura was forced to pay some amount of money to her. The jury's duty at trial, however, was only to determine Silas's true damages, not to ensure that Secura would be forced to pay some amount to Silas. The remarks by Silas's counsel clearly asked the jury to consider evidence of the settlement for an improper purpose, one that directly contravened the trial court's instruction that would soon follow. Under the circumstances, we are suspect of the proposition that the evidentiary error was harmless in this case.

## C. EXPERT TESTIMONY

Finally, we agree with Secura that the trial court abused its discretion[9] by excluding from trial the testimony of Slabey-Klar, Secura's proposed expert vocational rehabilitation expert. Before trial, Secura identified Slabey-Klar as an expert witness on its original and amended witness lists. Silas moved to exclude Slabey-Klar as an expert witness, contending that Secura had not responded to discovery requests seeking information about this witness and failed to timely identify Slabey-Klar as a proposed expert witness. The trial court denied Silas's request to strike Slabey-Klar as an expert witness, but ordered that she be made available for a deposition. She was deposed in June 2015.

At trial, Secura's counsel expressed his intent to call Slabey-Klar as an expert witness in the area of vocational rehabilitation, and Silas's counsel objected, explaining, "Her opinion is based on hearsay and [is] speculative. She never interviewed the plaintiff. She has no clue what her medical restrictions are. She claims she looked at plaintiff's deposition which was March 2014 and based it on that. She's not a doctor." In response, Secura's counsel explained that Slabey-Klar's opinion would be based on "her review of the medical records, her review of the deposition transcript," the trial testimony of several doctors, "as well as employment records regarding the employment history . . . plaintiff had." He explained that Slabey-Klar was "asked to do a transferrable skill analysis and do a market labor survey." Counsel further explained:

---

[9] We review for an abuse of discretion a trial court's decision regarding the admissibility of expert testimony. *Varran v Granneman (On Remand)*, 312 Mich App 591, 621; 880 NW2d 242 (2015).

[Her] testimony . . . [will be] based on the plaintiff's documented employment history[,] what her job skills are based on[,] and what the plaintiff's own testimony was in terms of her own restrictions, based on that are there occupations, are there jobs that would meet those qualifications. She [is] prepared to testify that there are. She doesn't have to allude to any specific conversations she had with any employer. The fact the employer didn't hire the plaintiff is irrelevant to the analysis as to whether or not this person, based on the restrictions that Ms. Slabey-Klar has been made aware of, and the basis of her opinion. She's permitted to testify as to that, your Honor.

Silas's counsel responded, "It's speculation, hearsay and irrelevant. It's for the jury to decide."

The discussion then turned to the extent of Silas's disability. Silas's counsel stated that Silas was totally disabled. Secura's counsel disagreed, and suggested that ultimately, this was a matter for the jury to determine. Noting the existence of disability certificates stating that Silas was totally disabled, the trial court asked, "[F]or her to be looking at the testimony of the doctors, wouldn't that be having a medical conclusion?" Secura's counsel rejected that notion, explaining that it was for the jury to decide whether Silas was totally disabled as a result of the accident. Secura's counsel explained that its medical experts had or would be testifying that she was not totally disabled. Ultimately, the trial court ruled as follows:

The Court would have to agree this testimony would be speculation and also have to form medical opinions. That doesn't appear from the offer of proof that the opinion is based on sufficient fact or data that would be reliable enough to be able to assist the trier of fact. It's a waste of time.

Secura now contends that the trial court abused its discretion by precluding Slabey-Klar from testifying. We agree. MRE 702 states the following:

If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

This rule places an obligation on trial courts to ensure that expert testimony is reliable. *Lenawee Co v Wagley*, 301 Mich App 134, 162; 836 NW2d 193 (2013). This obligation includes an examination of the data underlying an expert's opinions. *Chapin v A & L Parts, Inc*, 274 Mich App 122, 126; 732 NW2d 578 (2007). "While the exercise of this gatekeeper role is within a court's discretion, a trial judge may neither abandon this obligation nor perform the function inadequately." *Id*. (quotation marks and citations omitted). "The inquiry is not into whether an expert's opinion is necessarily correct or universally accepted. The inquiry is into whether the opinion is rationally derived from a sound foundation." *Id*. at 139.

In this case, Silas's counsel contended that Slabey-Klar's testimony would be speculative and would also require her to render medical opinions that her training and expertise did not qualify her to provide. The trial court ultimately agreed. However, Secura's counsel represented that Slabey-Klar's opinion would be based on the testimony of other experts. It is entirely proper for one expert to base his or her testimony on the findings and opinions of other experts. *Triple E Produce Corp v Mastronardi Produce, Ltd*, 209 Mich App 165, 175; 530 NW2d 772 (1995). Other expert witnesses had testified, or would testify, that Silas was not totally disabled as a result of the accident. Relying on this premise, for which there was clear evidentiary support, Slabey-Klar would then testify regarding what employment opportunities were available to Silas. To discern what employment opportunities would be suitable, Slabey-Klar would have relied on Silas's documented work history, Silas's own testimony, and other relevant evidence. Therefore, Slabey-Klar was not asked to speculate. Rather, her analysis called on her to rely on her knowledge and research into the labor market to render an opinion.

Slabey-Klar's testimony would have left any medical opinions properly in the hands of medical professionals who were qualified to give such testimony. The trial court seemed to believe that, because disability certificates indicated that Silas was totally disabled, Slabey-Klar would necessarily be required to reach a medical opinion that Silas was either partially disabled or not disabled before opining that certain jobs would be available to Silas. This ignores the expert testimony of medical doctors who opined that Silas was not, in fact, totally disabled as a result of the accident. Given the conflicting testimony, it was for the jury to decide whether Silas was totally disabled. The trial court improperly based its ruling regarding Slabey-Klar on its resolution of that factual question that should have been left to the jury.

An error in the exclusion of evidence, however, does not warrant a new trial "unless refusal to take this action appears . . . inconsistent with substantial justice." MCR 2.613(A). On one hand, it seems clear that the exclusion of this testimony did not affect the UIM portion of the judgment. The jury awarded over $6 million to Silas regarding this portion of her claim. Ultimately, however, the UIM verdict was reduced to account for the policy limit of $1 million. With regard to the UIM portion of the claim, the jury awarded $904,518.60 in noneconomic damages and awarded future noneconomic damages of $71,785 each year from 2015 through 2066. Secura challenges whether the last 11 of these years should have been included in the award. However, even removing these years from the jury's verdict, the jury awarded nearly $3 million in future noneconomic damages. Therefore, two portions of the award, untainted by the question of work-loss damages, easily push the verdict past the UIM limit of Secura's policy. Silas's ability to earn income, the only issue with respect to which Slabey-Klar would have testified, is therefore ultimately irrelevant to the UIM award.

Regarding the PIP portion of Silas's claim, however, by excluding Slabey-Klar's testimony, Secura was prevented from presenting evidence that could have caused the jury to reduce its award of work-loss damages. Had the jury heard testimony indicating that jobs exist that Silas is capable of performing, it may not have awarded work-loss damages to Silas, or may have reduced the amount of damages awarded. With regard to the PIP portion of Silas's claim, then, the trial court's error was not harmless.

## E.  CUMULATIVE ERROR

In sum, we agree with Secura that numerous errors occurred during trial, including errors pertaining to the misconduct of Silas's attorney, the trial court's improper admission of evidence regarding Silas's settlement with Fenton, and the trial court's improper exclusion of Slabey-Klar's proposed expert testimony at trial.  Although we are not fully convinced that any of these errors standing alone would necessarily require us to set aside the jury's verdict, "[t]he cumulative effect of several errors can constitute sufficient prejudice to warrant reversal even when any one of the errors alone would not merit reversal . . . ." *People v Dobek*, 274 Mich App 58, 106; 732 NW2d 546 (2007).  The term "cumulative error" refers to the overall unfair prejudice that results when the prejudice of several individual actual errors are weighed in the aggregate.  *People v LeBlanc*, 465 Mich 575, 591 n 12; 640 NW2d 246 (2002).  Considering the extensive and pervasive nature of the errors outlined in this opinion and the fact that each of the identified errors is on the verge of justifying reversal in its own right,[10] we are compelled to set aside the jury's verdict and conclude that Secura was denied a fair trial on the basis of cumulative error.

Reversed and remanded for a new trial.  We do not retain jurisdiction.

/s/ Henry William Saad
/s/ Deborah A. Servitto
/s/ Michael F. Gadola

---

[10] Silas's counsel's injection of race into the trial could be seen as sufficient in its own right to warrant reversal.  We prefer, however, to base our ruling upon the multiple errors that occurred in this trial.