*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

WILLIS MARCELL WILLIAMS,

        Defendant-Appellant.

UNPUBLISHED
February 21, 2023

No. 354686
Eaton Circuit Court
LC No. 19-020162-FC

Before: JANSEN, P.J., and REDFORD and YATES, JJ.

PER CURIAM.

Defendant appeals as of right his convictions by a jury of armed robbery, MCL 750.529, and resisting or assaulting a police officer, MCL 750.81d(1). The trial court sentenced defendant as a fourth-offense habitual offender, MCL 769.12, to concurrent prison terms of 25 to 40 years for the armed robbery conviction, and 5 to 15 years for the resisting or assaulting conviction. We affirm.

## I. BACKGROUND

Defendant and Andres Perez committed an armed robbery of a Quality Dairy in Grand Ledge on April 15, 2019, at approximately 10:45 p.m. Perez entered the store while disguised in women's clothing and a wig, asked for a pack of cigarettes, then produced what looked like a real handgun,[1] demanded all the cash from the register, and ran outside a short distance to where defendant waited in his car to drive them away. Perez soon took over the driving, a police chase ensued that ended in a crash, and defendant then fled on foot until a police officer tackled and apprehended him. The police found the precise amount of cash stolen from the Quality Dairy, including a specially recorded two-dollar bill, in defendant's pocket. Perez, who testified at trial

---

[1] The victim described the weapon as a realistic-looking semiautomatic handgun. At a pretrial hearing, the trial court described the weapon as "an Airsoft gun that looked like a handgun."

pursuant to a plea agreement, stated that he gave defendant the money with the expectation that defendant would use it for "bond money" in his anticipation of "going to jail."

Defendant admitted being with Perez at the time but denied being aware that the robbery took place because he had been under the influence of alcohol and marijuana and asleep or otherwise unconscious during the robbery. He claimed that he encouraged Perez to stop for the police when he awoke to discover that the police were pursuing them.

On appeal, defendant argues that the trial court erred by admitting evidence of defendant's involvement in two previous armed robberies, that the prosecutor misrepresented to the jury the agreement under which Perez agreed to testify, that his trial counsel provided ineffective assistance, and that his sentence for the armed robbery conviction is disproportionately harsh. We find no merit to defendant's arguments.

## II. ANALYSIS

## A. OTHER BAD ACTS

We review a trial court's decision whether to admit evidence of other bad acts for an abuse of discretion. *People v Kahley*, 277 Mich App 182, 184; 744 NW2d 194 (2007). A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes. *Id.*

The prosecution moved in limine under MRE 404(b) to admit evidence of defendant's participation in two other robberies. The trial court described the proposed evidence as follows:

> The salient facts are that, on April 2nd, 2019, at approximately, 11:44, that the defendant committed an armed robbery at Quality Dairy located at 917 East Cavanaugh Road. And then, there is a description of what the defendant wore and . . . how he went into the establishment, placed a handgun on the counter and demanded money. And then, a second incident at a Speedway gas station on Michigan Avenue. Again, a description of the same clothing and going into the establishment, asking about buying a beer, and then the defendant putting a handgun towards the employee and demanding money.

> . . . Mr. Perez has indicated that the defendant planned these robberies in Lansing and that he assisted him.

> Again, the record . . . did indicate that Perez has admitted he performed the robbery in question in this case and is going to be testifying.

> And so, the People wish to admit those two other robberies, because the People have argued that it shows that it was a scheme or plan that the defendant had previously done . . . .

The prosecutor explained that it intended to present the evidence to show preparation, scheme, and plan, and that it had relevance to show "knowledge, absence of mistake, intent and motive."

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." MRE 404(b)(1). However, such evidence may be admissible for other purposes, "such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material . . . ." *Id.* "[T]he rule is not exclusionary, but is inclusionary, because it provides a nonexhaustive list of reasons to properly admit evidence that may nonetheless also give rise to an inference about the defendant's character." *People v Mardlin*, 487 Mich 609, 616; 790 NW2d 607 (2010).

Our Supreme Court has set forth the test for admissibility of other-acts evidence as follows:

The evidence must be relevant to an issue other than propensity under Rule 404(b), to protect against the introduction of extrinsic act evidence when that evidence is offered solely to prove character. Stated otherwise, the prosecutor must offer the other acts evidence under something other than a character to conduct theory.

Second, . . . the evidence must be relevant under Rule 402, as enforced through Rule 104(b), to an issue or fact of consequence at trial.

Third, the trial judge should employ the balancing process under Rule 403. Other acts evidence is not admissible simply because it does not violate Rule 404(b). Rather, a determination must be made whether the danger of undue prejudice substantially outweighs the probative value of the evidence in view of the availability of other means of proof and other facts appropriate for making decision of this kind under Rule 403.

Finally, the trial court, upon request, may provide a limiting instruction under Rule 105. [*People v VanderVliet*, 444 Mich 52, 74-75; 508 NW2d 114 (1993) (quotation marks, citations, and alterations omitted), amended 445 Mich 1205 (1994).]

"[E]vidence of similar misconduct is logically relevant to show that the charged act occurred where the uncharged misconduct and the charged offense are sufficiently similar to support an inference that they are manifestations of a common plan, scheme, or system." *People v Sabin (After Remand)*, 463 Mich 43, 63; 614 NW2d 888 (2000).

In this case, in deciding to allow the evidence of defendant's other bad acts, the trial court explained:

[T]he robberies had the same general plan, where one person went into the store, asked the cashier a question, pulled a handgun and demanded cash.

. . . I think the Other Acts show that these two individuals had a plan, and the plan was to commit robberies that would benefit both of them, and that they intended the robberies to happen, and their goal was to get cash and possibly some goods, like in this case I guess it was cigarettes. So, I think there's a . . . proper purpose under 404(b).

The second prong of *VanderVliet* is . . . is it logically relevant to the proper purpose and the case at bar. And, again, in this case, . . . the Other Acts show that the charged robbery was part of the plan or scheme.

. . . [I]t is required that the charged offense is similar. And in this case, I think they're strikingly similar, so that there can be the inference that there was a common plan, scheme or system.

. . . [T]hey were convenience stores, they were in the same geographical area, they robbed the cashier, a handgun or what looked like a handgun was used, they were getting cash, and the other person was waiting in the vehicle a couple blocks away to be the driver, and it was over less than a two week time frame.

The third prong in MRE 403 and whether or not that would bar the evidence. [MRE] 403 would bar the other evidence only if there is an unfair prejudice that outweighed the probative value of the Other Acts.

And, again, in this case, I think it's very clear that the Other Acts is significantly probative.

And . . . Other Acts, by their nature, are gonna be prejudicial, but the rule allows for those to come in if there is a stronger probative value. And when you're talking about showing strikingly similar robberies within a short period of time using the same scheme, I believe that's important.

On appeal, defendant argues that the similarities between the two earlier armed robberies described by Perez and the instant offense were too general to render those other acts admissible. We disagree.

"The degree of similarity that is required between a defendant's other act and the charged offense depends on the manner in which the prosecution intends to use the other-acts evidence." *People v Denson*, 500 Mich 385, 402-403; 902 NW2d 306 (2017) (citations omitted). When the only purpose for admission of similar-acts evidence is to prove the identity of the defendant, it is admissible "only where the circumstances and manner in which the two crimes were committed are '[s]o nearly identical in method as to earmark [the charged offense] as the handiwork of the accused. . . . The [commonality of circumstances] must be so unusual and distinctive as to be like a signature.' " *People v Golochowicz*, 413 Mich 298, 310-311; 319 NW2d 518 (1982) (alterations in original), quoting McCormick, Evidence (2d ed), § 190, p 449; see also *VanderVliet*, 444 Mich at 66 ("*Golochowicz* identifies the requirements of logical relevance when the proponent is utilizing a *modus operandi theory* to prove *identity*.").

In this case, there is no dispute that the armed robbery took place, or that defendant accompanied Perez to the targeted location, and remained with Perez throughout the police chase that followed. The proper purpose for introducing the bad-acts evidence at issue, then, concerned proving defendant's participation in the charged offenses as an aider or abettor, i.e., to show defendant's motive, plan or scheme, knowledge, and intent related to the instant offense.

Using other bad acts to prove a common plan or intent requires a lesser degree of similarity than that needed to prove identity. *Sabin*, 463 Mich at 65. "Where the proponents' theory is not that the acts are so similar that they circumstantially indicate that they are the work of the accused, similarity between charged and uncharged conduct is not required." *VanderVliet*, 444 Mich at 69. "As, for example, when the evidence is proffered to rebut innocent intent, to show motive, consciousness of wrongdoing, true plan, or knowledge." *Id.* at 69 n 21. For purposes of showing that the defendant acted with criminal intent, when the defendant's identity and actions are not otherwise in dispute, "distinctive and unusual features are not required to establish the existence of a common design or plan. The evidence of uncharged acts needs only to support the inference that the defendant employed the common plan in committing the charged offense." *People v Hine*, 467 Mich 242, 252-253; 650 NW2d 659 (2002) (citation omitted).

Defendant challenges the trial court's characterization of the earlier and subject robberies as "strikingly similar" on the grounds that the earlier two robberies differed given that he and Perez traded roles as actual robber and initial getaway driver, and that the robber used no disguise in those earlier robberies. However, because identifying defendant as the person who accompanied Perez on the occasion in question was not the purpose for the evidence, which served to establish a common plan for purposes of shedding light on whether defendant aided or abetted Perez in the matter, a striking degree of similarity was not required. See *Hine*, 467 Mich at 252-253; *Sabin*, 463 Mich at 65; *VanderVliet*, 444 Mich at 69 and n 21.

The trial court did not abuse its discretion by admitting the evidence because defendant and Perez targeted convenience stores in the same geographical area, robbed the cashiers using what looked like a handgun, stole cash, and each time one of them waited in the vehicle a couple blocks away to flee. All of the crimes occurred within two weeks. These similarities supported the inference that defendant employed a common scheme or plan in committing the instant offense.

Further, the trial court appropriately provided the following jury instructions to guard against any unfair prejudice:

> If you believe this evidence, you must be very careful only to consider it for certain purposes. You may only think about whether this evidence tends to show that the defendant specifically meant to help Andres Perez commit armed robbery in Grand Ledge, that the defendant knew what the things found in his possession were and what Andres Perez was going to do, that the defendant acted purposely; that is, not by accident or mistake or because he misjudged the situation, that the defendant used a plan, system, or characteristic scheme that he had used before or since. You must not consider this evidence for any other purpose.
>
> So, for example you must not decide that it shows that the defendant is a bad person or that he is likely to commit crimes. You must not convict the defendant here because you think he is guilty of other bad conduct.

The record, therefore, does not support defendant's claim of error.

# B. PROSECUTORIAL MISCONDUCT

Defendant contends that Perez obtained a major sentencing concession to testify against him and argues that the prosecutor committed prosecutorial misconduct by misleading the jury to believe that Perez received only a minor sentencing concession and had no incentive to testify as the prosecution wished. Defendant argues that the prosecution improperly stated in closing rebuttal argument that Perez pleaded guilty "with . . . an agreement for 70 months," but that "his initial offer, before any testimony, before any statements, anything like that, is between 72 and 78," and asked the jury to consider "how good of a deal did we give him?"

The test for prosecutorial misconduct is whether the prosecutor "committed errors during the course of trial that deprived defendant of a fair and impartial trial." *People v Cooper*, 309 Mich App 74, 88; 867 NW2d 452 (2015). " 'Where a defendant fails to object to an alleged prosecutorial impropriety, the issue is reviewed for plain error.' " *Id.*, quoting *People v Aldrich*, 246 Mich App 101, 110; 631 NW2d 67 (2001), citing *People v Carines*, 460 Mich 750, 752-753, 764; 597 NW2d 130 (1999). "Review of alleged prosecutorial misconduct is precluded unless the defendant timely and specifically objects, except when an objection could not 'have cured the error, or a failure to review the issue would result in a miscarriage of justice." *People v Unger*, 278 Mich App 210, 234-235; 749 NW2d 272 (2008) (quotation marks and citation omitted).

Witness credibility is always at issue. See MRE 611(c). "[T]he prosecutor is permitted, as an advocate, to make fair comments on the evidence, including arguing the credibility of witnesses to the jury when there is conflicting testimony and the question of defendant's guilt or innocence turns on which witness is believed." *People v Flanagan*, 129 Mich App 786, 796; 342 NW2d 609 (1983) (citations omitted). However, such argument must be based on the evidence. See *People v Smith*, 158 Mich App 220, 231; 405 NW2d 156 (1987). It is improper for a prosecutor to offer the jury misstatements of fact. See *People v Warren*, 65 Mich App 197, 201-202; 237 NW2d 247 (1975).

Defendant fails to present a factual foundation for his claim of prosecutorial misconduct. In his brief on appeal, defendant states:

[T]he sentence Mr. Perez received was much below the guidelines and . . . the presumptive guideline range was manipulated downward. Rather than a guideline range of 51 to 85 months, [defendant] contends that Mr. Perez' guideline range should have been 81 to 135 months.

Mr. Perez was initially offered 72 months on the minimum at the pre-liminary examination. The offer changed to 78 months in exchange for testimony against [defendant] with the prosecution stating that this number could go down depending on what was said at the proffer interview. Although Mr. Perez ended up with a deal for 70 months, the parties and the trial court agreed that the sentencing exposure could have been much higher because of the high-speed chase. At Mr. Perez' sentencing, the trial court stated that "some might think it's a little bit on the light side, to be honest, given what happened," describing the car chase as "scary."

Meanwhile, at trial, the prosecutor downplayed the value of the plea stating that his minimum sentence merely went down from either 72 or 78 to 70. To the contrary, Mr. Perez' guidelines could have been 81 to 135 if Mr. Perez had been scored 10 points for being a leader in a multi-offender situation.[2] Mr. Perez got himself a disguise (which [defendant] had never used previously), he is the one who got a faux weapon, he committed the armed robbery and drove the vehicle on the high-speed chase while [defendant] was wearing a tether. Therefore, OV 14 should have been scored at 10 resulting in a higher guideline range.

Assuming without deciding the accuracy of defendant's accounts of how Perez's guidelines were and should have been scored, or what his sentencing court had to say, we nonetheless observe that defendant does not actually assert that anything in the record, in his or Perez's case, expressly indicates that lenient scoring of Offense Variable (OV) 14 was part of Perez's plea agreement. Further, defendant may not predicate his assertion that Perez received a greater sentencing concession than what he and the prosecutor represented at defendant's trial by speculating as to precisely why Perez did not receive a higher score for a particular offense variable, or by otherwise collaterally attacking the scoring of Perez's guidelines. See *Harrington v Richter*, 562 US 86, 99; 131 S Ct 770; 178 L Ed 2d 624 (2011) (presumption of adjudication on the merits may not be overcome by speculation regarding other reasons for the result); *Branch Co Bd of Comm'rs v Serv Employees Int'l Union, Local 586*, 168 Mich App 340, 346; 423 NW2d 658 (1988) (it is a "well-recognized rule that one party cannot claim another party's appellate opportunities" (quotation marks and citation omitted)). Moreover, relevant to OV 14, Perez's testimony in the instant case supported the conclusion that defendant, not Perez, had assumed a leadership role. According to Perez, defendant proposed targeting Quality Dairy stores that sold liquor or gasoline, lent his personal vehicle to the endeavors, actually conducted the first two robberies, proposed the additional robbery in this case, recommended using disguises, and suggested things for Perez to say in the course of the subject robbery. For these reasons, we reject defendant's claim of prosecutorial misconduct.

## C. IN EFFECTIVE ASSISTANCE OF COUNSEL

We review for an abuse of discretion a trial court's decision on a motion for a new trial. *People v Lemmon*, 456 Mich 625, 648 n 27; 576 NW2d 129 (1998), and a trial court's decision whether to hold an evidentiary hearing. *Unger*, 278 Mich App at 216. Whether a defendant has been denied the effective assistance of counsel is a mixed question of fact and law. *People v Dixon-Bey*, 321 Mich App 490, 515; 909 NW2d 458 (2017). The trial court's attendant factual findings are reviewed for clear error, while its determination whether those facts constituted a violation of the defendant's right to the effective assistance of counsel is reviewed de novo. *Id.* Because the trial court did not conduct an evidentiary hearing, our review is limited to the record. See *People v Jordan*, 275 Mich App 659, 667; 739 NW2d 706 (2007).

To prove ineffective assistance of counsel, a defendant must show that "(1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different."

---

[2] See MCL 777.44(1)(a).

-7-

*People v Trakhtenberg*, 493 Mich 38, 51; 826 NW2d 136 (2012) (citations omitted). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *People v Carbin*, 463 Mich 590, 600; 623 NW2d 884 (2001) (citation omitted). "Because the defendant bears the burden of demonstrating both deficient performance and prejudice, the defendant necessarily bears the burden of establishing the factual predicate for his claim." *Id*. (citation omitted). "In examining whether defense counsel's performance fell below an objective standard of reasonableness, a defendant must overcome the strong presumption that counsel's performance was born from a sound trial strategy." *Trakhtenberg*, 493 Mich at 52 (citation omitted).

## 1. PEREZ'S CREDIBILITY

Defendant argues that defense counsel failed to take advantage of opportunities to undermine Perez's credibility. We disagree.

"Evidence that shows bias or prejudice on the part of a witness is always relevant. Accordingly, testimony which touches the bias or interest of the witness is always admissible, and can be shown upon his cross-examination, and, if denied by him, can be proven on rebuttal . . . ." *Powell v St John Hospital*, 241 Mich App 64, 72-73; 614 NW2d 666 (2000) (citations, quotation marks, and alterations omitted). Counsel's decisions concerning the theories to present are presumed to be exercises of sound trial strategy. *People v Julian*, 171 Mich App 153, 158-159; 429 NW2d 615 (1988). To overcome that presumption, a defendant must show that counsel's failure to prepare for trial resulted in counsel's remaining ignorant of evidence, presentation of which would, with reasonable probability, have resulted in a different outcome. See *Trakhtenberg*, 493 Mich at 51-52. However, "[t]his Court does not second-guess counsel on matters of trial strategy, nor does it assess counsel's competence with the benefit of hindsight." *People v Russell*, 297 Mich App 707, 716; 825 NW2d 623 (2012).

To the extent that defendant challenges defense counsel's effectiveness regarding the sentencing concession Perez received for his testimony and for not objecting to the prosecutor's remarks regarding that arrangement, because defendant has failed and cannot establish prosecutorial misconduct in that regard, defense counsel would have had nothing to gain from posing any attendant objections. "Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel." *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010). Defendant's speculation regarding why one of Perez's offense variables was scored a certain way simply cannot properly support a claim of ineffective assistance. See *People v Tull*, 460 Mich 857, 857; 595 NW2d 840 (1999). We decline the invitation to remand this case for further development of defendant's collateral challenge regarding the scoring of one of Perez's offense variables.

Defendant additionally protests that Perez told the officer conducting a proffer interview that he handed defendant the cash from the charged robbery in hopes of ending up with a lesser sentence, or otherwise as an act of "self-preservation," but does not explain why that evidence brings to light a missed opportunity for cross-examination. Presumably defendant reasons that Perez's explanation at the interview did not comport perfectly with his eventual trial testimony that he gave defendant the money for defendant to use as "bond money" if Perez ended up in jail. But such inconsistency offered little if any opportunity to impugn Perez's credibility. Further, the

confession of a "self-preservation" motive to the interviewer actually comported with the later testimony about hoping to be bonded out of jail.

Defendant also points out that "Perez testified that [defendant] gave him his sister's number in the courthouse bullpen and asked him to lie for him to keep him out of trouble," and asserts, with no supporting citations to the record, that "the phone conversation was on April 29, 2019, and the court appearance was not until May 3, 2019." Perez in fact testified as follows, on direct examination:

> *Q.* [W]hile you were in jail in April, . . . were you housed in the same area as [defendant]?
>
> *A.* On the first day, for maybe an hour.
>
> *Q.* Okay, what about after that?
>
> *A.* After that, no.
>
> *Q.* All right. Were you able to have communication with him?
>
> *A.* Yes.
>
> *Q.* How?
>
> *A.* Every court date that we had we were in the, I guess, bullpen is what it's called by most of the other inmates—together.
>
> *Q.* During that time, were you able to communicate with him.
>
> *A.* Yes.
>
> *Q.* Did he ask you to do anything?
>
> *A.* Yes.
>
> *Q.* What'd he ask you to do?
>
> *A.* Over time, eventually, just take the blame for all this.
>
> *Q.* And did he ever ask ya [sic] to call a family member of his?
>
> *A.* Yes.
>
> *Q.* Who did he ask ya to call?
>
> *A.* I believe it was his sister.

* * *

*Q.* Did you call her?

*A.* At first, I didn't. But after a few weeks, I did.

*Q.* . . . Why did he want you to call his sister?

*A.* Essentially, at that point, we were under the understanding that we were both in this kind of together, that we could only really trust each other in comparison to everyone else. He said that I should probably build a rapport with his family because they would help support us through this process.

\* \* \*

*Q.* Were you ever given any information from him that she would do something for you in exchange for this?

*A.* Yes.

*Q.* What was that?

*A.* At one point, it was mentioned that she might help me financially.

*Q.* Okay. If you talk to her and told her what?

*A.* That I was the lone person in the robbery.

*Q.* Did you make that phone call?

*A.* Unfortunately so.

*Q.* And did you tell her that?

*A.* Yes.

*Q.* What else did you tell her about [defendant's] involvement in the robbery?

*A.* I said that he was asleep.

*Q.* Was that true?

*A.* No.

*Q.* Why are you saying something different now?

*A.* Because I'm not going to defend him.

*Q.* Okay. So, at that point in time—this would've been back in April, give or take, end of April?

*A.* Yeah.

* * *

*Q.* . . . Did you tell her that he had any involvement in it?

*A.* No, I said I acted alone.

The reference to a court appearance on May 3, 2019, corresponds to the first day of defendant and Perez's preliminary examination, the transcript of which does not present "bullpen" conversation. But defendant does not explain the basis for asserting that the phone conversation he references actually took place on April 29, 2019. Further, we note that Perez agreed only that it took place, "give or take, end of April," which approximation might well cover part of the following month. Further, we cannot eliminate the possibility that Perez's mention of "[e]very court date that we had we were in" covered one or more proceedings that took place before the preliminary examination and thus resulted in no notations in the record of court proceedings. Accordingly, defendant's theory about Perez's attributing to one date something he said on the phone in response to a conversation that took place a few days after that date offered defense counsel little opportunity to impugn Perez's credibility. Defendant thus fails to support his general protestation that "[d]efense counsel should have pointed out that Mr. Perez was mischaracterizing the facts to make himself look good and to keep himself out of trouble."

Defendant has failed to establish that defense counsel provided ineffective assistance related to the information Perez provided at trial. Therefore, we are not persuaded that defense counsel's performance fell below an objective standard of reasonableness.

## 2. JURY SELECTION

During jury selection, the trial court explored the issue of bias, and the jurors' ability to decide the case solely on the basis of the evidence, when the following exchange took place between the court and the one of the jurors:

*Q.* Would you have raised your hand to any of the questions . . . . Said yes or, hey, Judge, I want you to know something?

*A.* The only one that comes to mind is that I was a victim of a crime.

*Q.* Okay.

*A.* Our house was broken into.

*Q.* Okay.

*A.* And me and my family was sleeping upstairs at night.

*Q.* Oh.

-11-

*A.* So, that is the one that just makes me question if I could—I felt very vulnerable, very violated after that.

*Q.* Absolutely. And that was when you were living in Eaton County?

*A.* Correct.

*Q.* How long ago was that?

*A.* And it was, yeah, seven-ish years ago.

*Q.* So, you dealt with the Eaton County Sheriff's Department.

*A.* Yes.

*Q.* Was that a positive experience?

*A.* Yes.

*Q.* Okay. And did they find the person?

*A.* No, ma'am.

*Q.* So, you didn't deal with the prosecutor's office.

*A.* Correct.

*Q.* I'm sorry that happened to you. It's . . . scary. That's horrible. I mean, our houses are supposed to be our sanctuary. Somebody takes that away from you, it's scary. Kind of make you angry, too; right?

*A.* I think it would've been different during the day, when we were not home, but we were sleeping—

*Q.* Absolutely.

*A.* —right upstairs.

*Q.* Yup.

*A.* And there was an intruder in my home, so, yes.

*Q.* Yeah. It—so, but this case isn't about home invasion.

*A.* Okay.

*Q.* So, do you believe that you could be fair and impartial?

*A.* I believe, yes.

-12-

*Q.* Okay.

*A.* I will try my absolute best, yes.

The prosecution then asked the juror if she was "able to put aside the fact that you were a victim and just listen to everything here without that weighing you down every time?" and she responded, "I believe I can. I will try my absolute best."

Defense counsel and the juror then had the following exchange:

*Q.* Is there anything about . . . the fact that [defendant]'s African American, he may not have very much money, is there anything about that that we've made you think he's more likely to commit a crime?

*A.* No, sir.

*Q.* Does anything about those two things make you feel that he's less likely to be honest?

*A.* No, sir.

*Q.* [I]f I knew a crime was gonna be committed, I knew someone who was going to go into a McDonald's and steal something and I saw them doing it, I did nothing to help and I knew they were going to do it, would that make me an aider and abettor?

*A.* Well—

*Q.* Legally.

*A.* —I've listened to all of your conversations this morning, and my understanding is, legally, no.

*Q.* You might have a moral compunction to say, hey, this is happening, but not a legal one; right?

*A.* (No verbal response.)

*Q.* And you understand that that gentleman there does not have a duty to present any evidence, at all?

*A.* I do.

*Q.* And if I ask you at this point in the trial to make a decision of whether he's guilty or not guilty, what would your decision be at this point in time?

*A.* Not guilty.

*Q.* 'Cause no evidence has been presented.

*A.* Correct.

*Q.* Would you be able to hold the prosecutor to prove beyond any reasonable doubt each and every element of the crime?

*A.* I will do my best.

*Q.* Is there any questions that I had asked other jurors where your answer may be different?

*A.* No, sir.

*Q.* Do you have anyone in your family that is an addict or knows someone who has a drug history?

*A.* If you count alcohol as a drug, but drugs, no.

*Q.* Does the fact that they're an alcoholic maybe make them act different at times?

*A.* Yes, sir.

*Q.* And sometimes, as a result of being an alcoholic, you might question their credibility on certain things due to the alcoholism?

*A.* Um-hum.

*Q.* Do you feel that someone who has been given a deal, so to speak, to testify at someone else, they might be more likely, in order to get that deal, to shade things more in their favor?

*A.* I don't know that I would say that outright.

*Q.* Okay.

After defense counsel announced that he had no further questions, the trial court invited both sides to challenge the juror for cause, and they both declined.

Defendant argues that the juror at least left open the possibility that she would not be able to decide the case without bias against defendant, and that defense counsel provided ineffective assistance by not seeking to have her excused. We disagree.

"[T]he presence of a biased juror, like the presence of a biased judge, is a structural defect in the constitution of the trial mechanism that defies harmless error analysis . . . ." *Hughes v United States*, 258 F3d 453, 463 (CA 6, 2001). Accordingly, a defense attorney's decision not to challenge a biased juror cannot constitute sound trial strategy. *Id. Hughes*, however, stands for

the proposition that to maintain a claim that trial counsel provided ineffective assistance on the ground that counsel failed to strike a biased juror which prejudiced him, the defendant must establish that the juror was actually biased against him. *Id*. at 458.

Contrary to defendant's argument, the record does not clearly establish that the juror in question was biased. As the trial court noted, the crime of which the juror had been a victim, home invasion, was not among the crimes of which defendant was charged. Further, when the court asked the juror if she could be fair and impartial in this case, the juror replied, "I believe, yes," and "I will try my absolute best, yes." Defendant characterizes those answers as vague and equivocal. We disagree because the response, "I believe, yes," plainly indicated that the juror assessed herself as capable of the task; and the further response, "I will try my absolute best, yes," indicated that she understood her duty to set aside any bias and decide the case based on the evidence alone. The challenged juror displayed self-awareness and conscientiousness, not vagueness and equivocation. Moreover, the trial court elicited from the juror adequate responses to justify defense counsel's disinclination to seek having her excused.

The record indicates that defense counsel did not fail to be attentive, but zealously pursued defendant's interests. Defense counsel questioned the juror extensively, asked about possible racial or class bias, her understanding that guilt may not be established by mere knowledge of and presence at the commission of a crime, how use of recreational intoxicants might affect a person's behavior, and how a witness who made a deal over testifying might tend to "shade" testimony in favor of the party offering the deal. Defendant has failed to establish that a biased juror decided his case and he has failed to establish that defense counsel provided ineffective assistance in this regard.

## D. SENTENCING

We review for an abuse of discretion a trial court's sentencing decision. *People v Cain*, 238 Mich App 95, 130; 605 NW2d 28 (1999). An abuse of sentencing discretion occurs where the sentence imposed does not reasonably reflect the seriousness of the circumstances of the offense and the offender. *People v Steanhouse*, 500 Mich 453, 459-460; 902 NW2d 327 (2017), citing *People v Milbourn*, 435 Mich 630, 636; 461 NW2d 1 (1990).

We need not evaluate sentences falling within the sentencing guidelines for reasonableness, and must affirm them "unless there was an error in the scoring or the trial court relied on inaccurate information." *People v Anderson*, 322 Mich App 622, 636; 912 NW2d 607 (2018), citing MCL 769.34(10), and *People v Schrauben*, 314 Mich App 181, 196; 886 NW2d 173 (2016). However, we will do so if defendant establishes a constitutional error. *People v Powell*, 278 Mich App 318, 23; 750 NW2d 607 (2008).

In this case, defendant's 25-year minimum sentence for the armed robbery conviction fell well within his sentencing guidelines minimum sentence range of 136 to 420 months. Defendant does not challenge the scoring of the guidelines, assert that the trial court relied on inaccurate information, or raise a constitutional challenge beyond protesting that a disproportionate sentence violates due process. Instead, in his brief on appeal, defendant acknowledges that "the current state of the law indicates that a within guidelines sentence is reasonable," and advises that his present goal is to "preserve[] this issue for possible future appeals." We express no opinion on

defendant's prospects for appellate relief in tribunals beyond this one as we pay heed to the command of MCL 769.34(10), and related authorities, to affirm the challenged sentence on the ground that it fell within the guidelines range, and defendant has offered no reason to disregard the statutory "shall affirm" command.

Affirmed.

/s/ Kathleen Jansen
/s/ James Robert Redford
/s/ Christopher P. Yates