*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

YANI SANHARIB WARDA,

       Plaintiff-Appellee,

and

GREAT LAKES PHARMACY,

       Intervening Plaintiff,

v

FARM BUREAU GENERAL INSURANCE
COMPANY OF MICHIGAN, SCOTT ALLEN
KOHMESCHER, MARTIN TRANSPORT
SYSTEMS, and GREAT LAKES TRUCK
LEASING, LLC,

       Defendants,

and

PAUL FLYNN and JAMAL HAMMOUD,

       Appellants.

UNPUBLISHED
January 25, 2024

No. 362690
Macomb Circuit Court
LC No. 2021-002803-NI

YANI SANHARIB WARDA,

       Plaintiff-Appellee,

and

GREAT LAKES PHARMACY,

       Intervening Plaintiff,

v

FARM BUREAU GENERAL INSURANCE
COMPANY OF MICHIGAN,

       Defendant-Appellant,

and

SCOTT ALLEN KOHMESCHER, MARTIN
TRANSPORT SYSTEMS, and GREAT LAKES
TRUCK LEASING, LLC,

       Defendants.

No.  362698
Macomb Circuit Court
LC No.  2021-002803-NI

---

YANI SANHARIB WARDA,

       Plaintiff-Appellee,

and

GREAT LAKES PHARMACY,

       Intervening Plaintiff,

v

FARM BUREAU GENERAL INSURANCE
COMPANY OF MICHIGAN, SCOTT ALLEN
KOHMESCHER, MARTIN TRANSPORT
SYSTEMS, and GREAT LAKES TRUCK
LEASING, LLC,

       Defendants,

STEVEN KALKANIS and CHRISTIAN SCHUTTE,

       Appellants.

No.  362699
Macomb Circuit Court
LC No.  2021-002803-NI

---

Before:  K. F. KELLY, P.J., and JANSEN and HOOD, JJ.

PER CURIAM.

-2-

The appellants in these consolidated appeals challenge the trial court's order denying defendant Farm Bureau General Insurance Company's motion to quash plaintiff Yani Sanharib Warda's subpoenas seeking production of tax documents from individuals who performed insurance medical examinations (IMEs)[1] of Warda. Nonparties Dr. Paul Flynn, D.D.S, and Dr. Jamal Hammoud, M.D. appeal in Docket No. 362690, Farm Bureau appeals in Docket No. 362698, and nonparties Dr. Steven Kalkanis, M.D. and Dr. Christian Schutte, Ph.D., appeal in Docket No. 362699. This Court initially denied the appellants' applications for leave to appeal, but our Supreme Court remanded the appeals for consideration as on leave granted.[2] We affirm.

## I. BACKGROUND

This case arises from Warda's claims for no-fault personal protection insurance benefits for injuries he allegedly suffered in a June 10, 2020 motor-vehicle wreck. Warda treated with dozens of doctors and medical providers in Michigan and Illinois. Pursuant to MCL 500.3151, Farm Bureau required Warda to submit to IMEs. Appellants Paul Flynn (a dentist), Christian Schutte (a psychologist), and medical doctors Jamal Hammoud and Steven Kalkanis were among the professionals conducting the IMEs.

Warda's counsel issued subpoenas to the individuals who performed the IMEs, requesting production of the examining individual's "2019-2021 Tax returns and the documents that were used to evaluate Yani Warda." Farm Bureau moved to quash the subpoenas with respect to the request for the tax documents. At the hearing on the motion, the trial court noted Farm Bureau's position that Warda could pursue this information in depositions, but stated that simply accepting the examiners' word during a deposition was "not a way to conduct discovery," "especially in terms of delving into credibility." The court further indicated that it was "open to alternative means" of discovery, though defense counsel had "provided none." The trial court found that the doctors had "interjected themselves" into and were being paid for their participation in this litigation, so they had waived any privacy concerns related to this litigation. The court then entered an order denying Farm Bureau's motion to quash but granted its request at the hearing for personal information not to be divulged.

---

[1] The trial court followed this Court's lead in *Micheli v Mich Auto Ins Placement Facility*, 340 Mich App 360, 364 & n 3; 986 NW2d 451 (2022), and used the term "insurance medical examination" to describe the so-called "independent medical examinations" performed by the examining professionals. In *Micheli*, this Court reasoned that because the actual "independence" of these examinations is questionable, courts sometimes now use the term "insurance medical examination." *Id*. at 364 n 3 (noting that calling such IMEs "independent" "is a euphemistic term of art" because "an IME involves obtaining a second opinion from a doctor who is entirely selected and paid for by an insurance company, rendering the 'independence' of the examination somewhat questionable"). We do the same here.

[2] *Warda v Farm Bureau Gen Ins Co of Mich*, 511 Mich 859 (2023) (relating to Docket No. 362690); *Warda v Farm Bureau Gen Ins Co of Mich*, 511 Mich 860 (2023) (relating to Docket No. 362698); *Warda v Farm Bureau Gen Ins Co of Mich*, 511 Mich 859 (2023) (relating to Docket No. 362699).

Farm Bureau moved for reconsideration. Nonparties Flynn and Hammoud also moved for reconsideration, while nonparties Kalkanis and Schutte moved for relief from the trial court's order. At the hearing on these motions in late July 2022, counsel for Farm Bureau expressly did not object to producing Forms 1099 in lieu of the entire tax return documents. Counsel for Kalkanis and Schutte also did not object to producing the relevant 1099s. The trial court determined that evidence of the amount of income the IME examiners made from performing those examinations was relevant and discoverable. The court was, however, cognizant of the examiners' privacy concerns, especially for others who may be listed on the examiners' tax returns, so it narrowed the scope of the discoverable documents from the tax returns and forms to just the 1099s and W-2s. The trial court was not satisfied that only disclosing the 1099 forms from the IME schedulers was sufficient because that information by itself would fail to "show the proportion of the practice dedicated to" conducting IMEs. The court therefore ordered the nonparty examiners to produce their Forms 1099 showing income earned from conducting IMEs for the years 2019 through 2021, in addition to any Forms W-2 for those years concerning "income received from active clinical practice of medicine, instruction of students in an accredited medical school or residency, and clinical research program for physicians." The trial court did not order the production of the examiners' tax returns, such as Forms 1040, or other tax forms or schedules. These appeals followed.

## II. STANDARD OF REVIEW

We review for an abuse of discretion a trial court's decision whether to grant or deny discovery. *Micheli v Mich Auto Ins Placement Facility*, 340 Mich App 360, 367; 986 NW2d 451 (2022). A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes, and when it makes an error of law. *Id.* This Court reviews a trial court's factual findings for clear error. *Hardrick v Auto Club Ins Ass'n*, 294 Mich App 651, 660; 819 NW2d 28 (2011), citing MCR 2.613(C). A finding is clearly erroneous if we are definitely and firmly convinced the trial court made a mistake. *Id.* To the extent this issue involves the proper interpretation and application of court rules, we review those aspects de novo. *Id.*

## III. DISCOVERY OF TAX DOCUMENTS

Appellants argue that the trial court erred when it denied Farm Bureau's motion to quash and ordered the disclosure of the IME examiners' 1099s and W-2s for the tax years 2019 to 2021. We disagree.

## A. CIVIL DISCOVERY GENERAL PRINCIPLES

"Michigan follows an open, broad discovery policy that permits liberal discovery . . . ." *Micheli v Mich Auto Ins Placement Facility*, 340 Mich App 360, 371; 986 NW2d 451 (2022) (quotation marks and citation omitted). The purpose of discovery is to simplify and clarify issues. *Domako v Rowe*, 438 Mich 347, 360; 475 NW2d 30 (1991). This "commitment to open and far-reaching discovery does not," however, "encompass fishing expeditions." *Micheli*, 340 Mich App at 371 (quotation marks and citation omitted). "Discovery rules must be liberally construed to further the ends of justice." *In re CADP*, 341 Mich App 370, 380; 990 NW2d 386 (2022) (quotation marks and citations omitted). MCR 2.302(B)(1) governs the general scope of discovery and provides:

In General. Parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claims or defenses and proportional to the needs of the case, taking into account all pertinent factors, including whether the burden or expense of the proposed discovery outweighs its likely benefit, the complexity of the case, the importance of the issues at stake in the action, the amount in controversy, and the parties' resources and access to relevant information. Information within the scope of discovery need not be admissible in evidence to be discoverable.

Although such information must be "relevant," the information need not be admissible to be discoverable. MCR 2.302(B)(1). A matter is "relevant" when it has a "practical . . . bearing" on a party's claim or defense or is "pertinent" to it. *McClellan v Collar (On Remand)*, 240 Mich App 403, 410; 613 NW2d 729 (2000) (quotation marks and citation omitted). And MRE 401 provides that evidence is relevant if it "has *any* tendency" to make a fact of consequence more or less probable than without the evidence. MRE 401(a) and (b) (emphasis added).[3] Thus, as a general rule, "any document that is relevant and not privileged is freely discoverable upon request." *Hartmann v Shearson Lehman Hutton, Inc*, 194 Mich App 25, 28; 486 NW2d 53 (1992).

A party's tax returns and supporting documentation, though generally confidential, are not privileged under 26 USC 6103 and, contrary to appellants' position, as a general rule, are subject to discovery. *In re Pott*, 234 Mich App 369, 375; 593 NW2d 685 (1999). See also 26 USC 6103 (providing that tax returns and return information filed with the U.S. Secretary of Treasury are "confidential," and placing restrictions on federal and state government disclosures of such information). Nonparties, however, have a privacy interest in their tax documentation, and courts should take steps to protect that interest. See *Micheli*, 340 Mich App at 374 n 5 ("Individuals have a privacy interest in their personal tax returns"); *Fassihi v St Mary's Hosp*, 121 Mich App 11, 15-16; 328 NW2d 132 (1982) (reversing trial court order denying discovery of the plaintiff's tax returns in a wrongful termination suit; rejecting the plaintiff's argument that his returns should not be subject to discovery because he filed jointly with his wife and his wife had never been party to the action; directing the trial court to conduct an in-camera review redacting the wife's return information).[4]

## B. ANALYSIS

Warda asserted that the information was relevant and discoverable for two purposes: first, it would shed light on whether the examiners met the requirements to conduct IMEs under MCL 500.3151, and second, the information would be relevant to show potential bias. The trial court agreed with Warda, as do we.

---

[3] The Michigan Rules of Evidence were recently amended, effective January 1, 2024.

[4] Although *Fassihi* is not strictly binding pursuant to MCR 7.215(J)(1) because it was issued before November 1, 1990, as a published opinion, it nevertheless "has precedential effect under the rule of stare decisis" pursuant to MCR 7.215(C)(2). See *Legacy Custom Builders, Inc v Rogers*, ___ Mich App ___, ___; ___ NW2d ___ (2023) (Docket No. 359213); slip op at 5 n 1.

## 1. BIAS

The trial court did not abuse its discretion with respect to its determination that the tax documents were relevant to showing potential bias. It is well established that a witness's bias is always relevant. *Powell v St John Hosp*, 241 Mich App 64, 72; 614 NW2d 666 (2000) (citation omitted). See also *Swift Electric Light Co v Grant*, 90 Mich 469, 475; 51 NW 539 (1892) ("Testimony of this kind, which touches the bias or interest of the witness, is always admissible . . . ."). This Court explained in *Micheli*:

> To show that an expert witness is potentially biased, one may show that an expert has a pattern of testifying for a particular category of defendants, and one may show that an expert has a pecuniary interest in the outcome. Whether nonparty appellants have a history of serving as experts for insurance companies, and their compensation for doing so, bears on [the experts'] credibility, and it is therefore relevant. [*Micheli*, 340 Mich App at 373-374 (citations and footnote omitted).]

See also *id*. at 383-384 (GLEICHER, C.J., concurring) (noting that it is an "unremarkable . . . notion" that "an expert who regularly testifies for one particular attorney or client may be biased in a party's favor").

An IME examiner's history of performing IMEs and their income from conducting those IMEs is therefore relevant to potential bias. Appellants do not seriously dispute this. They instead assert that such information should be obtained by deposing the examiners. Appellants rely on MCR 2.302(B)(4), which provides, in relevant part:

> Discovery of facts known and opinions held by experts, otherwise discoverable under the provisions of subrule (B)(1) *and acquired or developed in anticipation of litigation or for trial*, may be obtained only as follows:
>
> * * *
>
> [a](ii) A party may take the deposition of a person whom the other party expects to call as an expert witness at trial. [Emphasis added.]

As this Court observed in *Micheli*, 340 Mich App at 369-371, the plain language of this court rule only applies to facts and opinions of experts "acquired or developed in anticipation of litigation or for trial." See also *Spine Specialists of Mich, PC v State Farm Mut Auto Ins Co*, 317 Mich App 497, 501-502; 894 NW2d 749 (2016) (distinguishing for discovery purposes facts acquired in anticipation of litigation from facts acquired through other means). And because the information sought in this case—the experts' past income—was not acquired or developed in anticipation of

litigation, MCR 2.302(B)(4) does not apply. *Micheli*, 340 Mich App at 371.[5] Appellants' reliance on MCR 2.302(B)(4) is thus misplaced.

Appellants also argue that even if their income from performing IMEs is arguably relevant, their income from other sources is not. They therefore argue that the trial court abused its discretion by compelling the disclosure of their W-2 forms, which show their income from other, non-IME-related sources. We disagree.

The amount an expert has made conducting IMEs is relevant for purposes of exposing potential bias, but so is the amount earned from IMEs relative to their total income. In other words, it is also relevant to determining the *percentage* of total income they earned from conducting IMEs. Knowing an expert's yearly income from conducting IMEs may provide *some* insight into potential bias, but alone that information does not tell a complete story. Instead, it requires knowing how that income amount relates to the expert's total yearly income. An individual could be more prone to bias if a significant and greater portion of that person's income is *dependent* on conducting IMEs. Thus, a person whose IME income constitutes only 10% of their total income is quite different than someone deriving 50% of their income from conducting IMEs. The trial court therefore did not abuse its discretion by allowing the W-2 income pertaining to non-IME work.

## 2. QUALIFICATIONS TO CONDUCT INSURANCE MEDICAL EXAMINATIONS

It is less apparent that the information was relevant for determining whether the examiners were qualified to conduct IMEs under MCL 500.3151. That statute provides, in relevant part:

(1) If the mental or physical condition of a person is material to a claim that has been or may be made for past or future personal protection insurance benefits, at the request of an insurer the person shall submit to mental or physical examination by physicians. A personal protection insurer may include reasonable provisions that are in accord with this section in a personal protection insurance

---

[5] Appellants Flynn and Hammoud in Docket No. 362690 argue that *Micheli* was wrongly decided, and that this Court should express its disagreement with that decision and convene a conflict panel under MCR 7.215(J)(2) and (3). Because we perceive no error in how this Court decided *Micheli*, we decline their invitation.

Farm Bureau argues that *Micheli* is distinguishable because, while there is no evidence of gamesmanship in the instant case, the expert in *Micheli* engaged in gamesmanship by attempting to withdraw once she saw the composition of the appellate panel. Contrary to Farm Bureau's assertion, this Court in *Micheli* did not "clearly consider[]" gamesmanship as a factor when deciding the *merits* of the issues. That the expert in *Micheli* withdrew her services after the case was submitted to a panel of this Court was significant only because of potential mootness concerns. *Micheli*, 340 Mich App at 375 n 6; *id*. at 378-380 (GLEICHER, C.J., concurring). The majority simply noted that even if the issue was moot, it would exercise its discretion to address the merits of the issue. *Id*. at 375 n 6 (opinion of the Court). Though gamesmanship arguably allowed *the* Micheli Court to review an otherwise moot issue, it did not affect the Court's actual analysis of the merits of the underlying issues.

policy for mental and physical examination of persons claiming personal protection insurance benefits.

(2) A physician who conducts a mental or physical examination under this section must be licensed as a physician in this state or another state and meet the following criteria, as applicable:

(a) If care is being provided to the person to be examined by a specialist, the examining physician must specialize in the same specialty as the physician providing the care, and if the physician providing the care is board certified in the specialty, the examining physician must be board certified in that specialty.

(b) During the year immediately preceding the examination, the examining physician *must have devoted a majority of his or her professional time* to either or both of the following:

(*i*) The active clinical practice of medicine and, if subdivision (a) applies, the active clinical practice relevant to the specialty.

(*ii*) The instruction of students in an accredited medical school or in an accredited residency or clinical research program for physicians and, if subdivision (a) applies, the instruction of students is in the specialty.  [Emphasis added.]

By limiting the W-2s to those pertaining to "income received from active clinical practice of medicine, instruction of students in an accredited medical school or residency, and clinical research program for physicians," the trial court was ostensibly allowing Warda to discover information related to whether the different examiners met the requirements of MCL 500.3151 to conduct IMEs in the first place.  But as appellants point out, a dollar amount related to conducting IMEs (identifiable from Forms 1099) and a dollar amount related to the tasks described in MCL 500.3151(2)(b)(*i*) and (*ii*) (identifiable from Forms W-2) do not fully address the actual requirements under MCL 500.3151(2)(b).  The statute only requires that a majority of the examiner's *time* be spent on certain non-IME matters; it is silent on income.

At first glance, the requested 1099s and W-2s, which merely contain dollar amounts with no reference to the time spent by an examiner on those tasks, are questionably helpful in determining whether an examiner meets the requirements of MCL 500.3151(2)(b).  We note, however, that the information need only be relevant, and not conclusive or dispositive, for it to be discoverable.  Thus, while the information may not directly shed light on an examiner's eligibility under MCL 500.3151(2)(b), we cannot say that the information has *no* use for that purpose.  Indeed, the time spent conducting IMEs could be deduced by questioning the examiners about the rates they charged for their services and calculating the time spent based on those rates and their income from conducting IMEs.  Flynn and Hammoud's attorney indicated at the July 2022 hearing that doctors may charge different amounts depending on the services provided, so there were "too many variables" to perform simple division of a "lump sum . . . by some hourly rate . . . ."  But even if that is true, their income from conducting IMEs is not irrelevant.  The "lump sum" information can be used to verify accuracy of deposition testimony regarding the services provided and the rates charged for those services, allowing Warda to more accurately ascertain the time

spent conducting IMEs for each doctor. Regardless, this issue is not dispositive because, as discussed, the examiners' income from IMEs (represented in Forms 1099) and the income from other wage jobs (Forms W-2) are relevant to show potential bias, and are therefore discoverable.

Farm Bureau also argues that because the no-fault act is similar to a statutory provision relevant to medical-malpractice actions, MCL 600.2169, which explicitly prohibits the discovery of experts' tax returns. It argues we should import those prohibitions into the no-fault act which is silent on the issue. We disagree.

MCL 600.2169(1) governs expert witness qualification requirements in medical malpractice cases and is generally similar to the provisions in the more-recently amended MCL 500.3151. Compare MCL 600.2169(1) with MCL 500.3151(2). But unlike MCL 500.3151, MCL 600.2169 contains provisions that explicitly bar certain pieces of information from discovery. Regarding these prohibitions, MCL 600.2169(5) provides, in relevant part:

> (5) In an action alleging medical malpractice, all of the following limitations apply to discovery conducted by opposing counsel to determine whether or not an expert witness is qualified:

> (a) Tax returns of the expert witness are not discoverable.

> (b) Family members of the expert witness shall not be deposed concerning the amount of time the expert witness spends engaged in the practice of his or her health profession.

> (c) A personal diary or calendar belonging to the expert witness is not discoverable.

Citing the similarity between MCL 500.3151(2) and the medical-malpractice statute, Farm Bureau essentially asks us to read into the no-fault act the prohibitions of MCL 600.2169(5), including the bar on tax returns being discoverable. We decline this invitation.

Courts must interpret statutes from the plain meaning of the words used, and should not "casually read" terms into an unambiguous statute. *McCormick v Carrier*, 487 Mich 180, 192, 209; 795 NW2d 517 (2010). See *In re Wayne Co Prosecutor*, 232 Mich App 482, 486; 591 NW2d 359 (1998) ("A court must not judicially legislate by adding into a statute provisions that the Legislature did not include."). Farm Bureau admits that the no-fault act does not contain language barring discovery of tax returns like that in the medical-malpractice statute. And, assuming the Legislature modeled MCL 500.3151 after MCL 600.2169, it is striking that the Legislature deliberately chose not to incorporate MCL 600.2169(5). Had the Legislature intended to incorporate the prohibition of the discovery of tax returns, it could have—and likely would have—included that language when it amended MCL 500.3151 in 2019.[6] We can only interpret its

---

[6] The Legislature significantly amended the no-fault act, including MCL 500.3151, by 2019 PA 21 and 2019 PA 22. The Legislature last amended MCL 600.2169 in 1993, effective April 1, 1994. See 1994 PA 78.

decision to not include that provision as the Legislature not wanting to include that provision. See *Alan v Wayne Co*, 388 Mich 210, 256-257; 200 NW2d 628 (1972). See also *Farrington v Total Petroleum, Inc*, 442 Mich 201, 210; 501 NW2d 76 (1993) ("Courts cannot assume that the Legislature inadvertently omitted from one [portion of a] statute the language that it placed in another statute, and then, on the basis of that assumption, apply what is not there.").

### 3. DISCOVERY IS PROPORTIONAL TO THE NEEDS OF THE CASE

Because the documents sought are relevant and nonprivileged, the next question is whether discovery of the documents is "proportional to the needs of the case . . . including whether the burden or expense of the proposed discovery outweighs its likely benefit . . . ." MCR 2.302(B)(1). In *Micheli*, this Court held that this analysis requires the trial court to "balance the value of [the] plaintiff's proposed discovery . . . against the burden of the discovery, including addressing nonparty appellants' privacy concerns and the practically available alternative means for the plaintiff to discover the information." *Micheli*, 340 Mich App at 376.

Here, the IME examiners have an interest in maintaining the privacy of the income information contained in their Forms 1099 and W-2. See *Micheli*, 340 Mich App at 374 n 5. But, as discussed, the income information from those documents is highly relevant to potential bias by the examiners. The burden or difficulty of producing those documents is also minimal. The trial court noted that the parties had not submitted any evidence establishing that disclosure of the documents would be "unduly burdensome in any way." The court ultimately narrowed the scope of the subpoena request to just Forms 1099 and Forms W-2, rather than the returns themselves or other attached schedules and forms.. The court also found that "these different tax records would be readily accessible." The trial court did not clearly err. Tax documents for recent past tax years necessarily already exist. Though some redaction may be necessary, we do not consider that unduly burdensome. And, aside from deposing the examiners, there is no other practical way for Warda to obtain this information. Even a deposition, however, may not provide Warda sufficiently-accurate information in this regard. Indeed, the trial court observed that the parties presented no evidence showing that the examiners "could testify with any precision" about their IME work. The court also rejected the idea that Warda "just accept [the examiners'] testimony" and be "unable to dispel or confirm their testimony through documentation."

Appellants' privacy concerns, though valid, were addressed by the trial court. The court ordered that the documents be held in confidence by Warda's and Farm Bureau's attorneys, were "not [to] be photocopied or reproduced by any means," were to "be used only in connection with [the lawsuit]," and were to be either returned to the original owners or destroyed within 30 days of the conclusion of the lawsuit. The trial court took a reasonable approach to protecting the examiners' legitimate privacy interests. See *Fassihi*, 121 Mich App at 15-16. And, notably, just because these documents are subject to discovery does not mean that they ultimately will be admissible at trial. See MCR 2.302(B)(1). Thus, the actual privacy concerns implicated are less than if the documents and information were put into the public eye in general.

In sum, when balancing the value of discovery of the tax documents against the burden of producing them, the trial court did not abuse its discretion when it allowed discovery of the examiners' Forms 1099 and W-2.

-10-

We affirm.

/s/ Kirsten Frank Kelly
/s/ Noah P. Hood